No. 45,941

NEIL HOTCHKISS, Administrator of the Estate of L. W. Werth, Deceased; FERDINAND WERTH, CHRISTINE SUCHY, ARMELLA FREIGHBERGER, LEONARD WERTH and REGINA BASGALL, *Appellees*, v. EMIL WERTH and VICTORIA WERTH, *Appellants*.

(483 P. 2d 1053)

Opinion filed April 10, 1971.

*Marvin E. Thompson,* Russell, of Thompson, Holland & Arthur, argued the cause, and *Richard M. Driscoll,* of Russell, was with him on the brief for the appellants.

*M. John Carpenter,* of Great Bend, argued the cause, and *Hugh D. Mauch,* of Great Bend, was with him on the brief for the appellees.

The opinion of the court was delivered by

PRICE, C. J.: This was an action by the administrator of the estate of decedent grantor and five of his children to set aside a deed given to another one of his children (and his wife) on the grounds that the grantee son occupied a fiduciary and confidential relationship with his father and that the deed was the product of undue influence and was without adequate consideration and void.

The trial court set aside the deed.

Defendant grantees have appealed.

Because of the nature of the case and questions involved, it is necessary to detail the evidence at some length.

The grantors in the deed were L. W. Werth and his wife Rosa. They will be referred to as Mr. Werth (or father) and Rosa.

The grantees in the deed were Emil Werth and his wife Victoria. They will be referred to as Emil and Victoria. Emil is a son of the grantors.

Together with the administrator of Mr. Werth's estate, the plaintiffs are other children of Mr. Werth and Rosa, and are brothers and sisters of Emil.

Mr. Werth and Rosa were long-time residents of La Crosse. The deed in question was dated June 24, 1965, and was executed by them on July 23, 1965. It was recorded on August 6, 1965. Mr. Werth was about 85 years of age and Rosa about 80. He died in May 1966 and she in August 1968. This action was filed in July 1967, and was tried in January 1969.

We summarize plaintiffs' evidence.

*Leonard Werth* (a plaintiff):

He was the oldest of ten children of Mr. Werth and Rosa. For a number of years, under an oral arrangement with his father, he farmed two quarter sections of land belonging to his father. In the latter part of 1964 the father demanded a written lease. He described his father as being a man who "knew what he wanted and how he wanted it done, and as being strong-willed". Following hospitalization in 1963 his father appeared to have undergone a "personality change", and along about this time Emil (defendant grantee) became more "attentive" to his father.

*Regina Basgall* (a plaintiff):

She was the youngest child of Mr. Werth and Rosa. Prior to the time her father was hospitalized in 1963 he was a very "strong-willed" man and dominating in nature, but that later a "change" came over him. In November 1965 her father said that he had leased his land to Emil for three years for $12,000, that the money was in the bank, and her mother Rosa appeared happy about the matter.

*Ferdinand Werth* (a plaintiff):

He was a son of Mr. Werth and Rosa. Prior to his father's illness in 1963 he was a stern and dominant type of man, but later underwent a "change". In December 1965 he (the witness) received a

Christmas card addressed in his father's handwriting. Instead of his street address in Great Bend was written his telephone number. Upon his father's release from the hospital Emil appeared much more "interested" and closer to his father.

*Christine Suchy* (a plaintiff):

She was a daughter of Mr. Werth and Rosa, and lived in Great Bend. Prior to his illness, her father was "quite a man", strict, and expected and demanded obedience from his children. There were times in 1964 and 1965 when her father did not seem to know her. In the fall of 1964 Rosa became ill and she (the witness) took her parents to her home in Great Bend in order to look after them. Emil did not approve of the arrangement and in the latter part of October 1964, came and removed the parents back to La Crosse. The witness was not at home at the time. In the summer of 1965 her parents—categorically, at least—denied having sold the farm, and spoke critically of Emil. Following Emil's removal of her parents back to La Crosse her father was not as friendly to her as he had been.

*Armella Freighberger* (a plaintiff):

She was the oldest daughter of Mr. Werth and Rosa, and lived in Great Bend. Prior to her father's illness in 1963 he was strong-willed, determined, and "made up his own mind on things", but on occasions in 1965 he appeared rather "confused", failed to recognize her at times, and was not the same self-reliant person he had been.

We now summarize defendants' evidence.

*Robert Hanhardt:*

He was an accountant, and for a number of years had prepared Mr. Werth's income tax returns—the last time being on March 10, 1965—just a few months prior to the execution of the deed in question. He described Mr. Werth as being completely competent in business affairs, that he knew what his property holdings were, their value, what he wanted to do with this property, and that he was a man "who made his own decisions".

*J. E. Hester:*

He was the manager of the Federal Land Bank Association of Larned. He had known Mr. Werth since 1952 and saw him in La Crosse from time to time. In June 1965 Emil came to his field office in La Crosse to make application for a loan, saying that he was purchasing some land from his father for $12,000. Later that day the witness went to the home of Mr. Werth in order to verify the

details of the transaction as told to him by Emil. Mr. Werth stated that according to his will he was leaving the SW quarter to Emil and was selling him the NW quarter—but that "he was deeding Emil the whole half section now". He also mentioned that he was selling him the one quarter at a reduced price because Emil was going to look after and take care of him. He further told the witness that he "knew this is probably going to cause dissatisfaction with the children, but this is the way I want it". In 1920 Mr. Werth had purchased the half section for $17,000.

Because of past experiences in land transactions involving elderly people, and because of Mr. Werth's comment that it would probably cause dissatisfaction with the other children—the witness had requested a doctor's certificate as to the health and mental condition of Mr. Werth and Rosa. (This will be referred to later.) He was present in the home of Mr. Werth on July 23, 1965, when the deed was signed. The local banker, William Moeder, also was present. They discussed the deed and its provisions with Mr. Werth and Rosa, and it was read aloud. There was nothing in the demeanor, conduct or actions of Mr. Werth and Rosa to cause him to think they were incapable of giving a deed, and they did not appear to be under the influence of anyone. Both understood they were signing a deed and were competent to transact their business affairs. He had not been aware of the fact the other children felt their father had undergone a "change in personality" following surgery in 1963, and neither did he know that Emil had a power of attorney from his father.

*Dr. Robert L. McCorkle:*

He lived in La Crosse and was the Werth family physician. During 1965 Mr. Werth was coherent and competent to transact his personal affairs. At the request of J. E. Hester (above) he made an examination of Mr. Werth and Rosa on June 29, 1965 and made a written certificate of his findings. In this certificate he stated that he had talked with them about their land and what they planned to do with it. They were fully cognizant that Mr. Hester and Emil had discussed the matter with them and that they planned to sell it to Emil. He further stated that both were fully competent to execute a deed and to transact their business affairs. He had been treating them for high blood pressure, and conceded that their "condition" varied from time to time and that

an individual suffering from advanced arteriosclerosis might be somewhat more subject to suggestion and influence.

*William Moede:*

He had been in the banking business at La Crosse since 1926 and had known Mr. Werth, Rosa and their children for many years. He had for years serviced Mr. Werth's account at the bank. Pursuant to a telephone call from J. E. Hester he went to the Werth home on July 23, 1965, to take the acknowledgement—as a notary public—of the signatures of Mr. Werth and Rosa on a deed. When he arrived they were sitting in the living room—alone in the house. Having known them for years—part of their conversation was in German. They discussed the transaction, and the Werths recognized fully that they were selling the land to Emil for $12,000. Mr. Werth remarked that such amount "was probably more than Mommie and I will ever need", and that they could depend on Emil and his wife Victoria to take care of them in the future.

J. E. Hester arrived shortly—with the deed. The four of them discussed it—and Rosa said that "this is what we have been wanting to do and is what we should have done long ago". A few minutes later Emil and Victoria arrived. Mr. Werth and Rosa signed the deed. Mr. Moeder took their acknowledgement as a notary. Neither Mr. Werth nor Rosa appeared to be under the influence of anyone—and "they knew what they wanted to do— why they wanted to do it—and that they were going to do it"— and that they signed the deed as a free and voluntary act on their part. The deed was held in escrow at the bank pending final closing of the Federal Land Bank loan to Emil. On August 6, 1965, the deal was closed and a check for $12,000 was handed to Mr. Werth and Rosa at the bank. After a short discussion Mr. Werth decided on two savings certificates at the bank—$8,000 for one year and $4,000 for six months.

*Walter Shoendaller:*

He lived at La Crosse, and was a farmer. Mr. Werth was his uncle by marriage and he had known him, Rosa and all the Werth children all of his life. He had noticed no change in Mr. Werth following his illness in 1963, and described him as being "a man of his own mind and when he made up his mind that was it— and nobody changed it for him". In 1963 Mr. Werth had complained to him about the tenancy of Leonard, and that Leonard had not paid him for some farm machinery.

*Victoria Werth:*

She was the wife of Emil, and a grantee in joint tenancy in the deed. On about June 11, 1965, she heard Mr. Werth tell J. E. Hester that he "had never given Emil anything compared to the other boys". Her testimony as to the actual signing of the deed was substantially as testified to by J. E. Hester and William Moeder, above. Mr. Werth had a strong personality, was determined, and was not under the control or domination of anyone.

*Emil Werth:*

He was a son of Mr. Werth and Rosa, and a grantee in joint tenancy in the deed. In May 1965, Mr. Pius Moeder, who was his father's neighbor, told him that his father wanted to see him. He went by the next day, and his father told him of his desire to sell the NW quarter for $7,200—the father retaining a life estate, and he inquired if Emil was interested. Several days later they again conferred. Emil stated he would prefer to pay more money—without a life estate—on account of possible financing problems. A price of $12,000 for the NW quarter was agreed upon, and his father remarked that he would "give him the SW quarter now instead of having him wait until his death to receive it through his will". Accordingly, the witness proceeded with the loan application. His testimony as to the execution of the deed by his father and mother on July 23, 1965, was substantially the same as that of the other witnesses heretofore related.

His father and mother had executed a power of attorney to him in 1963, but he had never exercised any of the rights under it prior to his father's death. From time to time his father discussed with him the problems he was having with the other children. Not until after his father's death was he aware of a codicil to his will in which the SW quarter was devised to him. He felt that his father trusted him and had confidence in him. He admitted that in 1938 he had been convicted of a felony in the state of Colorado.

In rebuttal—for plaintiffs—Christine Suchy testified that in the summer of 1965 she and her sister Armella saw William Moeder at the bank in La Crosse and he told them their father had sold the land, that he was not "in the deal but that he could have told their father some things but that as it was his land, he did not, and just thought Oh, Well". She further testified that in 1964 her father had received an offer from Pius Moeder to buy the two quarters for $40,000 but that he refused—commenting that he "was not so old that he had to get rid of his property and that he had kids to take care of".

In rebuttal—for plaintiffs—Regina Basgall testified that in the fall of 1964 her father told her that he had received an offer from Pius Moeder to purchase the two quarters for $40,000.

In rebuttal—for defendants—William Moeder testified that in the summer of 1965 Christine Suchy and possibly Armella, her sister, came to the bank and inquired what was paid for the land and what was done with the money. He advised them it was on time deposit. He did not believe that his father, Pius Moeder, had made an offer to buy the land, because his father, whose confidence he had—had never consulted him about it.

In addition to all of the foregoing, the evidence also was to the effect that as of the summer of 1965 the fair market value of the two quarter sections was about $42,000.

In November 1963 Mr. Werth and Rosa executed a general power of attorney to Emil. It was drafted by Mr. Driscoll, Emil's attorney, but rights under it were never exercised by Emil (and the court so found) until after his father's death.

Medical records established that Mr. Werth was discharged from the hospital on January 1, 1964, and was not again hospitalized until October 19, 1965—for a two-day period.

In a second codicil to his will under date of December 31, 1963, Mr. Werth devised the SW quarter to Emil with the proviso that he pay the total sum of $2,000 to his five sisters within two years from testator's death—such payment to be a lien on the land so devised until paid.

In rendering judgment the trial court made extensive findings of fact—40 of which were largely a recital and summary of the evidence substantially as heretofore related.

In addition, the court found that when discussing business matters with Robert Hanhardt—the accountant—Mr. Werth said he had sold the land for exactly what he had in it—and that such discrepancy was evidence that he was not in full possession of the facts as a well-informed business man should be.

Finding No. 41 reads:

"41. While there is no direct evidence on this point, this Court finds from all the evidence that L. W. Werth did not know the fair market value of his land at the time he conveyed it to Emil. He considered it to be much less than it actually was. He was ignorant of the true extent of the inflation that had taken place in the 1960's and he did not know that it was comparatively easy to borrow $12,000.00 or more on farm land worth as much as his was worth. He was not in tune with the times. This is one of the many reasons he needed

independent advice which he did not get from Hester or Moeder, and which advice he was entitled to have furnished him whether he wanted it or not, by Emil as his confidential and fiduciary advisor. While he was a man who was mentally competent, he did not have knowledge and was in no position to form an intelligent judgment as to all of the business problems entailed in a land transaction that deprived him of at least 60% of the assets of his estate. He possibly knew what he was doing, but he did not know and understand its consequences. He did not know that Emil's promise to care for him and Rosa could not be legally enforced. He did not know his land was worth over $42,000.00, and that he could just as easily borrow $12,000.00 against it as could Emil. Had he been so advised, and had he understood, it is safe to conclude from the evidence that he would not have completed the sale. He had been a shrewd business man. He was not one at the time he made the sale of the land to his son Emil."

### Conclusions of law Nos. 1 through 5 read:

"1. Although the mere relationship of parent and child does not raise a presumption of confidential and fiduciary relationship, the evidence in this case discloses that there was a strong confidential and fiduciary relationship between L. W. Werth and his son, Emil Werth, during the period from 1963 to the time of his death and thereafter with Rosa Werth, his mother, until her death.

"2. Whether or not a confidential or fiduciary relationship has been abused, to a great extent, depends on the particular facts and circumstances of the individual case. There are no exact definitions or fixed definite boundaries for that class of human relations commonly known as confidential and fiduciary. These relationships are based on principles of common honesty and require fair dealings between the parties. In this connection this Court finds that Emil Werth did not deal fairly with his father and mother with reference to his purchase of their lands.

"3. Where a confidential relationship exists between grantor and the grantee of a deed, there is a presumption that the deed was obtained by the grantee through undue influence, and because of that presumption the burden of proving that the transaction was conducted in good faith and was not the result of the exercise of any undue influence or an abuse of the confidential relationship, is on the grantee. The grantee must show the utmost of good faith on his part.

"4. A grantee of a deed from a grantor with whom he enjoyed a confidential and fiduciary relationship is required to show as evidence of his good faith in adhering to the duties imposed on him by said confidential relationship, that the grantor had independent advice, or at least had opportunities for independent advice and refused it, and that he, said grantee, recommended and instructed the grantor that such independent advice was prudent, judicious and desirable. The defendants in this case failed to sustain the burden of proof with reference to compliance with the general rule that their grantors, L. W. Werth and Rosa Werth, had independent advice. In the alternative they failed to sustain the burden of proof that it was proper in this case that an exception to the general rule should be followed, viz: that where a person supposed to have been at a disadvantage was of strong and independent mind, and in a position to form

an intelligent judgment, and the transaction was fair in all respects, refused or would have refused independent advice if offered or made available to him. The evidence disclosed that while L. W. Werth was strong-willed and would probably refuse advice given to him by most of his children, he would, nevertheless, have seriously considered following the advice of his son, Emil. Emil was under an obligation to insist that his father and mother have independent advice concerning this transaction between them that so obviously inured to Emil's personal benefit.

"5. A lack of good faith on the part of Emil and evidence of the exercise of undue influence by him is further substantiated by the inadequacy of consideration paid by him to his father and mother. Emil paid his parents $12,000.00 for land worth more than $42,000.00, and to make it even more inadequate he borrowed all the money on the property he was receiving, an act which L. W. [Werth] and Rosa Werth could have done themselves if they had been so advised."

Accordingly—the court held the deed to be void and of no force and effect—and set it aside.

The grantees—Emil and his wife Victoria—have appealed.

We believe the court's ruling to be erroneous and that the judgment must be reversed.

So that there will be no misunderstanding about the matter—in considering this case we are fully aware that it is what frequently is referred to as a "fact case"—that findings of the trial court, when supported by any substantial evidence, must stand and are not to be set aside on appeal even though there is evidence which would support a contrary finding, that we are not to weigh the evidence— and that the scope of appellate review is to determine whether findings are so supported. Inherent in the rule also is the duty to determine whether the conclusions of law are supported by the findings of fact.

Stripped to its bare bones—the basis of the trial court's ruling appears to be that Emil occupied a fiduciary and confidential relationship with his parents—that the deed was procured through undue influence exercised by him—and, there being no showing of independent advice—the deed must fall.

Assuming—without deciding—there is substantial evidence to support the finding of such relationship we find no substantial evidence to support the finding of undue influence. In fact, all of the evidence is to the contrary. It is quite true that Mr. Werth was well along in years—that he had been hospitalized—from time to time had been under the care of a physician and, according to some of his children—was not the "same person" he had been. Under

like circumstances—this of course could be said of many people. The facts of the negotiations leading up to the deed and its actual execution have been related. All of the evidence establishes that Mr. Werth and Rosa were fully competent, knew what they were doing, and why—and that the deed was their free, independent and voluntary act.

In *Cersovsky v. Cersovsky,* 201 Kan. 463, 441 P. 2d 829, it was said that in order for a court to be justified in setting aside a deed on the ground of undue influence it must be proved that at or about the time of the execution there was an influence bearing upon the will of the grantor so potent as to destroy his free agency and to substitute the will of another; that undue influence does not consist of mere gratitude for kindness, affection or esteem where a conveyance is induced thereby, nor does it operate in the way of suggestions, entreaties or importunities short of overpowering a grantor's will; that the test of undue influence is whether the party exercised his own free agency and acted voluntarily by the use of his own reason and judgment, and that the mere fact there may have been power, motive and opportunity to exercise undue influence or overreaching does not permit the inference that such influence was exercised. ( p. 467.)

In *Frame, Administrator v. Bauman,* 202 Kan. 461, 449 P. 2d 525, it was said that a confidential relationship does not poison or brand as fraudulent every transaction between parties, one of whom occupies a fiduciary status toward the other; that where good faith has been established on the part of the beneficiary and no undue influence has been exerted and where the transaction under scrutiny is shown to have carried out the true and freely formed intentions of the grantor the law does not stigmatize it as fraudulent and void simply because of the relationship existing between the parties, and that rules applicable to transactions between individuals where the relationship exists are not intended to preclude gifts which honestly reflect the unfettered wishes of those who make them, but rather are intended to prevent persons who stand in positions of confidence and trust from taking advantage of their positions at the expense of those entitled to their loyalty and protection. (pp. 467-8.) See also *Jernberg v. Evangelical Lutheran Home for the Aged,* 156 Kan. 167, 131 P. 2d 691 at page 173.

As bearing on the question whether Emil exercised undue influence on his parents the trial court apparently attached considerable

weight to the fact there was an inadequate consideration. The undisputed facts are that years ago Mr. Werth paid $17,000 for the two quarter sections. As of 1965 they were worth about $42,000. The sale here was of the NW quarter for $12,000. In the second codicil to Mr. Werth's will the SW quarter was devised to Emil—with the proviso that he pay to his sisters the sum of $2,000. Mr. Werth explained that both quarters were to be included in the deed—saying that he "was giving the SW quarter to Emil now rather than making him wait until after his death". It cannot be denied that Mr. Werth was entirely within his rights in doing what he did. In *Bowen, Administrator v. Hathaway*, 202 Kan. 107, 446 P. 2d 723, it was said—

"The plaintiff-administrator contends the consideration paid for the deed was inadequate. Even though the consideration paid by defendant for the remainder interest in the land may not have been equal to the full market value of the land it was an adequate consideration. It was legally sufficient to render the deed operative to pass title to the property. In such case the amount paid bears only upon the question of undue influence." (p. 111.)

In order to establish undue influence in cases of this type the law requires more than mere opportunity to exert it—or suspicions on the part of those who feel aggrieved. In our opinion a careful examination of this record discloses no substantial evidence whatever to support a finding or conclusion that this deed was the result of undue influence in procuring it.

The trial court also based its decision on the lack of independent advice. In *In re Estate of Carlson*, 201 Kan. 635, 443 P. 2d 339, it was held—

"The requirement of independent advice is designed to provide assurance that the aged or infirmed or otherwise dependent person conferring the benefit knew what he was doing and did it of his own free act and will, and to see that no undue advantage was taken of him. (Syl. 5.)

"The rule of independent advice is applicable only under circumstances where the evidence warrants it. Our decisions do not require application of the rule where the beneficiary or party upon whom is cast the burden of proof presents substantial evidence that the gift, deed or contract was made in good faith, not induced by undue influence, and for a valuable consideration." (Syl. 6.)

See also the *Frame* case, above, syl. 9, and corresponding portion of the opinion.

Under the evidence in this case there simply was no room for application of the rule requiring independent advice.

We find no substantial evidence in the record to support a finding

or conclusion that this deed was procured through undue influence exerted by Emil or anyone else. To the contrary—all of the evidence establishes that Mr. Werth and Rosa were competent, that they knew what they wanted to do, and why—and that the execution of the deed was their free, knowing, independent and voluntary act.

Accordingly—the judgment setting aside the deed is reversed.

FROMME, J., dissenting: The trial court listened patiently to all the witnesses in this case and concluded there was evidence of undue influence. The trial court found the deed from the parents to a son and his wife was the product of undue influence exerted by the son and his wife. After reading the cold record a majority of this court, overlooking their appellate role on appeal, have retried this case on the record, as indicated by their recitation of evidence. They arrive at a different conclusion than did the trial court.

Before an appellate court should reverse a trier of the facts on a question of fact there should be no substantial evidence to support the finding and judgment. All relevant evidence which supports the finding and judgment should be accepted as true and given all reasonable inferences. This the majority of the court fails to do.

Generally there are four elements present to establish undue influence: (1) a person who is subject to influence; (2) an opportunity to exert undue influence; (3) a disposition to exert undue influence; and (4) a result indicating undue influence. (25 Am. Jur. 2d, Duress and Undue Influence, § 36 p. 397.)

Without attempting to detail the evidence supporting the trial court's judgment and finding I wish to summarize evidence in the record which supports the four elements referred to in the foregoing paragraph.

The father and mother who executed this deed were both over eighty years of age. Both were chronically ill when the deed was signed. The father was suffering from arteriosclerosis, cancer of the prostate and from the effects of a broken hip. He died within a year after the deed was executed. The mother had suffered a heart attack before the deed was signed and was wholly reliant upon her husband. She died before the case was tried. Both had been under the constant care and treatment of a doctor.

Neither drove a car and both relied on the son and daughter-in-law to look after them and provide all transportation. The son farmed his father's land, and held a power of attorney which authorized him to look after the father's business. At times the father either failed or refused to recognize some of his other eight children. He was hard of hearing and used a magnifying glass to read.

This son and daughter-in-law had every opportunity to exert undue influence upon these old people. In looking after their wants, including their transportation, they were with them constantly. This 320 acre farm was the major source of income for the father and mother. In farming this land, paying rents and taxes and in looking after the land the son had control of the livelihood of his parents. This close control and association continued for about two years prior to the execution of the deed. The negotiations for acquiring the farm were carried on by the father and son in the absence of other members of the family and in the absence of outside advisers. After the deal was made and after negotiations were concluded, then and only then were others brought in to draw the deed and take care of the formal acts of transfer. After the death of the father and mother who was left to testify of undue influence in these negotiations?

There was a disposition shown to exert undue influence. Another son had farmed the land for many years and after the father's health broke in 1963, this son was notified to quit farming and turn the land over to the preferred son who later got the deed to the farm. At this time the family lawyer was replaced by a lawyer of the preferred son's choosing. The preferred son and his wife took the father and mother from the home of a daughter when the daughter was not at home. Prior to that the son had visited the parents in the daughter's home and in the presence of the daughter told his father that the conditions in the daughter's house were awful and that all the daughter was after in caring for her parents was the land. The preferred son said to his father, "Oh, yes, you just don't know them, and their [sic] working for that farm." The daughter-in-law testified that she heard the father tell the manager of the loan association later that the father wanted to make the transfer because, "It wasn't so much his children, as it was the in-laws that were always trying to take his land away from him and trying to run his business." Clearly seeds of distrust had been previously planted by the son.

There was a result indicating undue influence.  The parents had nine children.  If this deed is valid sixty percent of their entire estate was deeded to one son shortly before death.  The effect of the deed is to destroy the testamentary disposition of the parents' estate which was approved by codicil as late as December 31, 1963.  By the will and codicil all three sons were to receive portions of this land and the preferred son, Emil, who was to receive the SW ¼, was to pay $2000 to the five daughters in varying amounts within two years of death.  The will was not changed after the deed was delivered.  The deed will cancel all these provisions of the will.  In this relatively short period of time between December 31, 1963, and June 24, 1965, (one year and six months) a son who had not been close to his father and mother, who had lived in other states and had visited only occasionally became the preferred son.  He replaced his older brother who had farmed the land or portions thereof for many years.  He obtained a power of attorney from his father.  He became his father's confidant and adviser.  He provided his father's transportation and delivered his groceries.  In this same short period he obtained 60% of his parents' estate and in doing so replaced other children who had previously cared for their parents.

There was substantial competent evidence to support the judgment and findings of the trial court and I respectfully dissent.