(561 P.2d 889)
No. 48,302

GALE R. McCONACHIE, *Appellee*, v. WILLIAM EUGENE McCONACHIE, *Appellant.*

Petition for review denied April 13, 1977.

Opinion filed February 25, 1977.

*Thomas E. Gleason* and *Thomas E. Gleason, Jr.*, of Gleason and Gleason of Ottawa, for the appellant.

*Robert W. Green* of Robert W. Green, Chartered, of Ottawa, for the appellee.

PARKS, J.: This is an action to set aside a deed from a father to one of his adult sons. The trial court entered judgment in favor of the plaintiff (another son) declaring the deed void because of the confidential relationship that existed between the grantor and grantee at the time the deed was executed.

The facts may be summarized as follows: William C. McConachie (Will) and Lucille McConachie (Lucille), husband and wife, raised two sons, Gale R. McConachie, plaintiff, and William Eugene McConachie (Gene), grantee-defendant, on a 170-acre farm northeast of Ottawa, Kansas. The farm is the subject of this lawsuit.

Gale left the farm in the 1930's and through the years has been employed as a court reporter, private secretary and public stenographer. At the time of trial he was self-employed in the field of office services in Puerto Rico, where he had lived for 15 years. Prior to 1967 Gene had lived at the farm from time to time but was most often away from home employed as a bartender.

Early in 1967 Gene and his wife Edith moved to the farm to reside with and care for Will and Lucille. Gene rented 42 acres of pasture and barn lots from his father and raised cattle and sheep. Both Gene and Edith had jobs away from the farm. In the fall of 1968 Gene and Edith moved to an apartment at the Ottawa Country Club where they assumed managerial duties. This employment lasted until January 1970 when they returned to the farm and resumed care of Lucille and Will.

Gale did not live on the farm at any time after he left in the 1930's. However, he did return during the fall every year or two to visit the family for two weeks during his mother's lifetime. Such visits occurred in 1964, 1966, 1967, 1969, at his mother's funeral in 1971, and at his father's funeral in 1973. Gale corresponded regularly with members of the family, particularly with his mother, Lucille, and his sister-in-law, Edith. In addition, he called his parents six or seven times a year for holidays or birthdays.

After Gene and Edith returned to the farm in 1970, they began to assume more duties and to occupy it more as their own home. Gene negotiated some of the rentals for tenant farmers while Will continued to oversee others. Following Lucille's illness (beginning about 1970), Edith cooked, laundered and generally kept house. Edith and Gene also expended time transporting and caring for Lucille and Will. Will did not drive his car after 1970. Edith and Gene therefore shopped for groceries and drove Lucille and Will to appointments—doctor, barber shop, voting, bank.

The trial court specifically found Will could dress, shave, eat his meals at the table and care for himself up to a short time prior to his death. This conclusion was based, apparently, on Edith's letters. Her letters indicate that Will was confused at times, often forgetting his wife's death or reliving his childhood.

First mention was made of the deed in question at a family dinner in early 1973. Someone observed how the family had grown, and Will stated a desire that Gene and Edith stay on the farm. Marilyn Shockey, a legal secretary from Oklahoma who later married Edith's son, Bill Holland, was one of the dinner guests. She observed that Edith and Gene had taken good care of the place and Will could be assured of their staying if he deeded the farm to them. The next morning Marilyn suggested to Will

again that he "really should take care of" the deed mentioned the night before. Will stated, "That would be all right." Marilyn then volunteered to have the deed drafted by her employer in Oklahoma and returned to Will. Around March 1, 1973, Marilyn and Bill returned with the deed. Marilyn testified the deed was not read to Will in her presence, and no mention was made of Gale.

Gene and Edith arranged for the signing of the deed after it had been in Will's possession two or three weeks. Edith called their own banker and arranged for him to meet with them that evening to notarize Will's signature. Will patronized a different bank, and the banker involved was not acquainted with Will. After the banker's arrival, Gene, who was in possession of the deed, excused himself and summoned his father. Will appeared five or ten minutes later. The deed was placed in front of Will at the dining room table, and Will was asked if he knew what he was signing. Will replied that he did. At no time during the signing was the deed read to Will or explained to him. After Will signed it, the banker acknowledged the signature, affixed his notary seal and left. Edith promptly mailed the deed to Marilyn in Oklahoma City. Marilyn's employer opened the envelope and instructed Marilyn to send the deed to Ottawa for recording. This transaction occurred approximately six months before Will's death at the age of 92.

Earlier disposition of the property described in the deed had been discussed and, apparently, attempted. One neighbor since 1928 who had frequent conversations with Will, testified Will had indicated an intention for Gene to have the farm since the 1950's. The neighbor said this statement had been repeated as many as 10 to 12 times during the years—the last time occurring after Lucille's death. However, a will dated June 30, 1965, left all real estate first to Lucille and then to the brothers in equal parts.

Earlier in 1953 a letter from Lucille to Gale stated Lucille and Will had deeded the property "to you boys." The understanding was that if the farm was to be divided any other way the boys would have to agree to it. About that time Gale indicated to his parents they might deed him a smaller portion of the acreage and deed Gene the bulk of the farm ground. Lucille wrote Gale in 1957 that she and Will might deed Gale 79 acres and the contents of the house. Will wrote Gale in 1960 that a will leaving the property to the brothers jointly was filed in the lawyer's vault.

Gale testified that he saw another deed in which he and Gene were named grantees in September 1971 (the time of his mother's death).

A letter from Lucille to Gale, written July 6, 1971, reflected Lucille's belief that Gene was "determined to get the place at any cost."

It was only after their father's funeral on September 26, 1973, that Gale discovered the existence of the deed in controversy. He told Gene he thought they ought to have the deed to them recorded (referring to the earlier joint deed). Gene then told Gale he had bought the farm from their father for $10.00. At the same time, Gene handed Gale certificates for 581 shares of United Income Fund and stated Gale could have them. These shares were appraised in Will's estate at $7,233.45. The 170-acre farm was appraised as of date of death at $76,500.00. The remainder of Will's estate included a checking account balance of $2,186.97, a 1949 Ford Coupe valued at $50.00, and household furniture, furnishings and personal effects valued at $550.00.

The trial court found that the facts of Gene and his wife having lived in the farm home for more than five of the last six and one-half years of Will's life, having assisted Will in handling his financial affairs and managing the farm, and the fact of Will's advanced age and infirmity, had resulted in a confidential relationship. This finding is uncontroverted.

The basic issue is whether the grantee, who occupies a confidential relationship with the grantor, has the burden of showing by convincing evidence that (1) the act was that of the grantor and did not occur at a time when there was influence bearing upon the will of the grantor so potent as to destroy his free agency and to substitute the will of another, (2) the grantor clearly understood and comprehended what he was doing, and (3) the transaction was either for valuable consideration or that the grantor was given the benefit of independent advice regarding the consequences.

In *Frame, Administrator v. Bauman*, 202 Kan. 461, 468, 449 P. 2d 525, the court said:

"It is for the trial court to determine, in the first instance, whether the presumption of undue influence existing by virtue of a confidential relationship has been satisfactorily overcome by the party on whom the burden rests. That court bears the responsibility of weighing conflicting evidence and assessing the

credibility of witnesses.

"Under familiar rules, our responsibility on appeal is to ascertain whether the findings of the trial court are supported by substantial competent evidence. *(Cersovsky v. Cersovsky* [201 Kan. 463, 441 P. 2d 829].) In making this determination, we are required to consider the evidence in its most favorable aspect in relation to the party who prevailed in the court below. *Riedel v. Gage Plumbing & Heating Co.*, 202 Kan. 538, 449 P. 2d 521.)"

The rule is clearly stated in Syl. 5 of *Frame, Administrator v. Bauman*, supra:

"Where a transaction has been entered into between persons, one of whom stands in a confidential relationship to the other, the burden rests upon the person occupying such status to show that the transaction was conducted in good faith and did not result from the exercise of undue influence on his part."

Following the rule expressed in *Frame, Administrator v. Bauman*, supra, the trial court found in this case that the deed was void and must be cancelled and set aside for the reason that the defendant, who had a confidential relationship with his father, had failed to establish by clear and convincing evidence that the execution of the deed was the will and desire and freely formed intention of his father and that the grantor clearly understood what he was doing.

The trial court detected evidence of Will's increasing physical infirmity and mental deterioration. There was no evidence that the deed was ever read or explained to Will, and it is clear that he was not the initiating party. He merely replied once that a deed "would be all right," and another time that he knew what it was. All parties involved in procuring, notarizing or recording the deed were members, or soon to become members, of the interested family, or were agents of that family. Finally, the $10.00 consideration paid by Gene was a nominal figure in relationship to the appraised value of $76,500.00 for the farm.

In reviewing the record it is clear the trial court found that the defendant had failed to carry the burden of rebutting the presumption of undue influence.

The defendant cited *Hotchkiss, Administrator v. Werth*, 207 Kan. 132, 483 P. 2d 1053, to support his position. The facts in the *Hotchkiss* case are different from the case at bar in that, prior to the execution of the deed, the grantor had discussed business matters with his accountant, had conferred in detail with the manager of the Federal Land Bank Association of Larned concerning the transaction in question, had been examined by his

family physician and certified to be fully competent to execute a deed and to transact his business affairs, and had conversed with his banker concerning the transaction at the time the deed was executed and acknowledged.

It is apparent that the facts in *Hotchkiss* could be found sufficient to rebut a presumption of undue influence under the previous Kansas decisions. However, in comparing the *Hotchkiss* analysis to the case at bar, we do not find the mitigating facts which would rebut a presumption of undue influence.

We disagree with the assertion of appellant that *Hotchkiss*, supra, required a showing of actual rather than presumed undue influence. As we read the case, the court simply stated that it found no substantial evidence in the record to support a finding or conclusion that the deed was procured through undue influence exerted by the grantees or anyone else.

Furthermore, it is our opinion that under the facts and circumstances of this case, there was sufficient evidence to warrant the application of the rule requiring independent advice, and to question whether the father exercised his own free will in executing the deed.

Accordingly, we hold that the findings and conclusions made by the trial court are supported by the record.

In view of our decision, other points raised on appeal need not be discussed.

The judgment is affirmed.