NOT DESIGNATED FOR PUBLICATION

No. 122,944

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JOHN A. MOORE and JOYCE E. MOORE TRUST,
and JOHN W. MOORE, TRUSTEE,
*Appellants*,

v.

JEBEDIAH MOORE and STEVEN L. MOORE,
*Appellees*.

MEMORANDUM OPINION

Appeal from Brown District Court; KIM W. CUDNEY, judge. Opinion filed May 13, 2022. Reversed and remanded with directions.

*Michael R. Ong*, of Ong Law Firm, of Overland Park, for appellants.

*John W. Fresh and Andrew E. Werring*, of Farris, Fresh & Werring Law Offices, of Atchison, for appellees.

Before ATCHESON, P.J., HILL and CLINE, JJ.

PER CURIAM: This intrafamilial battle over valuable farmland in far northeast Kansas returns to our court for a second time following the Brown County District Court's entry of findings of fact and conclusions of law that Steven Moore did not unduly influence his mother Joyce Moore to sell about two quarter sections to his son and her grandson Jebediah at far below market value. The transaction substantially drained a trust Joyce and her late husband John had established and effectively disinherited their three other children. The trust has appealed. We conclude the trial evidence does not support

1

key factual findings of the district court, and its judgment upholding the sale, in turn, cannot stand. The supported findings show Steven did not meet his burden to overcome a presumption of undue influence that arose from his confidential or fiduciary relationship with Joyce. We, therefore, reverse the judgment for Steven and Jebediah and remand with directions that the district court enter judgment for the trust rescinding the land sale in accordance with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

The issues before us now have narrowed from the earlier appeal, and we assume the reader's familiarity with that opinion, *Moore v. Moore*, 56 Kan. App. 2d 301, 429 P.3d 607 (2018) (*Moore I*). John and Joyce set up the John A. and Joyce E. Moore Revocable Living Trust in 1999 and placed several tracts of land in the trust. They amended the trust at least twice over the years. In 2014, the trust held a quarter section, including the Moores' home; a quarter section that included the home of Steven and his wife; and a third quarter section. The trust provided that upon the deaths of both John and Joyce, Steven would receive the quarter section on which he lived. The other two parcels would go to John W. Moore, Sue Hartter, and Wilma Rainwater—the Moores' other children. As trustees, John and Joyce could move assets into or out of the trust.

John and Joyce farmed the land. Joyce always deferred to John when it came to the finances of the farm. Of the children, only Steven chose to join in the farming operation as a career. Jebediah, who was in his early 20s, had shown a similar inclination and worked on the farm. As John and Joyce got older, Steven assumed a greater role in the day-to-day operation of the farm and in the financial management of the business. John and Joyce hoped to keep the farm "in the family," so the trust provided that should John W., Sue, or Wilma wish to sell their interests in the land, they had to give Steven a first option to buy at a fair-market price.

2

In May 2014, John was hospitalized with terminal cancer. Joyce, then 80 years old, had been emotionally and physically depleted in caring for him. They separately signed a contract and related documents selling their home and the surrounding two acres to Jebediah on terms that could be fairly characterized as quite favorable to their grandson. John died days later. In *Moore I*, Joyce and the trust challenged that transaction on the grounds she and John lacked the capacity to contract because of their immediate adverse circumstances and even if they had capacity, they had been unduly influenced by Steven. Without belaboring the procedural history, those claims have been decided adversely to them. That transaction has not been challenged in this appeal.

Jebediah moved in with Joyce to assist her and to maintain the family home. Steven assumed control of the farming operation and oversaw Joyce's personal finances and other matters. According to Joyce, Steven repeatedly told her over the summer that she should let Jebediah buy the two quarter sections of farmland designated in the trust to go to John W., Sue, and Wilma. If she did not, Steven warned, he could not afford to purchase the land from them and, as a result, the family farm could be sold off. Steven disclaimed pestering Joyce about the farmland.

In September 2014, Joyce sold the two quarter sections to Jebediah for $292,000 with a $5,000 down payment and the balance to be paid to Joyce over 30 years in monthly installments at two percent annual interest. An appraisal done in probating John's estate valued the two tracts together at about $1.4 million. Don Cashman, a Hiawatha lawyer, drafted the contract of sale at Steven's request. He and his law firm had done real estate and tax work for John and Joyce for about 30 years. The firm had prepared the trust and handled the amendments to it. Cashman did not consult individually with Joyce about the land sale, the terms of the contract, or how the transaction would deplete the trust assets.

3

A year later, Joyce and the trust filed this civil action against Steven and Jebediah to set aside both the May and September contracts on equitable grounds of legal incapacity or undue influence and against Cashman's law firm for malpractice and breach of fiduciary duty. Joyce and the trust settled with the law firm before trial, and those claims were dismissed, leaving only the equitable claims against Steven and Jebediah. Although Steven and Jebediah have been named defendants throughout the litigation, Steven orchestrated the land sales to Jebediah. The evidence essentially shows Jebediah to have been a supernumerary in the legal drama. Father and son are united in legal interest and have been represented by the same lawyer from the outset.

A jury heard testimony and received documentary evidence during a four-day trial in September 2016 and returned verdicts for Steven and Jebediah. Joyce and the trust appealed. In *Moore I*, we found the district court had improperly instructed the jury on the law governing undue influence, so we reversed the verdicts on those claims. Because all of the claims were equitable—meaning no one was entitled to a jury trial in the first place—we remanded with directions that the district court consider the evidence and render findings of fact and conclusions of law as if there had been a bench trial in September 2016. See *Moore I*, 56 Kan. App. 2d at 323-24, 326.

The district court filed a lengthy memorandum decision in February 2020 ruling for Steven and Jebediah. Joyce died between the jury trial and the district court's memorandum decision, and John W. was substituted as trustee for the trust. The trust has appealed and challenges the sufficiency of the district court's findings and conclusions as to the September 2014 sale of the farmland to Jebediah.

4

LEGAL ANALYSIS

*Governing Legal Principles*

In the customarily recited common-law standard, an appellate court reviews a district court's judgment following a bench trial by examining the factual findings to determine if they are supported by substantial evidence and by then asking whether those findings warrant the legal conclusions upon which the judgment rests. We must defer to the district court's assessment of witness credibility and its resolution of other conflicts in the evidence. But our examination of the conclusions together with the judgment compose a question of law, so our answer owes no particular deference to the district court. See *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014); *Kansas Health Care Stabilization Fund v. St. Francis Hospital*, 41 Kan. App. 2d 488, 503, 203 P.3d 33 (2009).

We are statutorily directed to accept a district court's findings of fact in a bench trial unless they are clearly erroneous, giving "due regard" to witness credibility determinations. K.S.A. 2020 Supp. 60-252(a)(5). Although the substantial evidence standard arguably may impose greater restraints on appellate courts than the clearly erroneous standard, we need not resolve the point today. Compare *Purnell v. Inland Wetlands and Watercourses Commission of Town of Washington*, 209 Conn. App. 688, 725-26, 269 A.3d 124 (2022) (substantial evidence more restrictive than clearly erroneous) with *Pegasus Wind, LLC v. Tuscola County*, ___ N.W.2d ___, 2022 WL 572498, at *2 (Mich. App. 2022) (substantial evidence standard same as clearly erroneous standard). Our conclusion does not turn on a fine distinction between the two—a distinction that isn't always drawn. See *Weber v. Tillman*, 259 Kan. 457, 461-62, 913 P.3d 84 (1996) (district court's findings of fact must be "supported by substantial competent evidence" and "cannot [be] set aside . . . unless clearly erroneous").

5

Before heading deeper into the law, we point out a foundational fact that guides the legal analysis. The district court found that Steven had a confidential or fiduciary relationship with Joyce in 2014 leading up to her signing the contract selling the farmland to Jebediah based on their familial relationship and the extent to which he had taken over managing the farming operation and Joyce's personal finances. The evidence amply supports that conclusion, and Steven does not dispute the finding in this appeal. The existence of such a special relationship enhances the judicial scrutiny of undue influence claims aimed at setting aside contracts. We outline those legal principles and then delve into the district court's findings and conclusions.

In *Moore I*, we summarized the applicable law this way:

"Kansas courts have long recognized that contracts between parties in a confidential or fiduciary relationship require particular scrutiny should their fairness be challenged. The danger, of course, lies with the party in whom trust has been placed and his or her ability to exploit the relationship to gain unfair advantage in any transaction with the other party. As an antidote, the courts have required the trusted party to prove the absence of undue influence over the trusting party in bargaining and contract formation. *Frame, Administrator v. Bauman*, 202 Kan. 461, 467, 449 P.2d 525 (1969); *Smith v. Smith*, 84 Kan. 242, 244-45, 114 P. 245 (1911). In effect, the courts presume undue influence in contracts between parties occupying a confidential relationship. The *Frame* court captured the rule this way: When parties occupying a confidential relationship enter into a contractual transaction, 'the burden rests upon the person [in whom confidence has been placed] to show that the transaction was conducted in good faith and did not result from the exercise of undue influence.' 202 Kan. 461, Syl. ¶ 5; see *Curtis v. Freden*, 224 Kan. 646, 651, 585 P.2d 993 (1978) (recognizing rule and citing *Frame*); PIK Civ. 4th 124.09 Comment (noting ruling)." 56 Kan. App. 2d at 305.

Accordingly, Steven bore the burden of proving the absence of undue influence on Joyce in selling the farmland in September 2014. In short, Steven had to rebut the presumption

6

of undue influence arising from the confidential or fiduciary relationship he occupied with Joyce. *Frame v. Bauman*, 202 Kan. 461, 468, 449 P.2d 525 (1969).

A party to a contract has been unduly influenced—thereby, vitiating the agreement—if he or she has been prevented from "'exercis[ing] his [or her] own free agency and act[ing] voluntarily by the use of his [or her] own reason and judgment.'" *Frame*, 202 Kan. at 468 (quoting *Cersovsky v. Cersovsky*, 201 Kan. 463, 467, 441 P.2d 829 [1968] [quoting *Homewood v. Eggers*, 132 Kan. 256, Syl. ¶ 5, 295 P. 681 (1931)]). Undue influence requires that degree of pressure sufficient to overpower the party's free will. *Cersovsky*, 201 Kan. at 467. Whether undue influence has infected a contract entails a factual determination to be drawn from the totality of the circumstances. By its very nature, undue influence surreptitiously invades and corrupts, especially in a confidential relationship, so proof almost invariably depends upon circumstantial rather than direct evidence. *Cresto v. Cresto*, 302 Kan. 820, 833, 358 P.3d 831 (2015); *In re Estate of Hock*, 322 S.W.3d 574, 579 (Mo. App. 2010).

The trust contends the district court erred in requiring Steven to prove the absence of undue influence by a preponderance of the evidence rather than by a heightened clear and convincing standard. We are unpersuaded. The trust cites only *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 3, 187 P.3d 594 (2008), and *State v. Duncan*, 44 Kan. App. 2d 1029, Syl. ¶ 11, 242 P.3d 1271 (2010), for that proposition. Neither is apt.

In *In re B.D.-Y.*, the court recast the clear and convincing standard as a level of proof falling between a preponderance and beyond a reasonable doubt rather than as an enhanced quality of proof required to establish a preponderance in some situations. 286 Kan. at 691-93. The appeal concerned the district court's finding that a child was in need of care. The court did not presume to address the standard of proof to be applied in undue influence challenges to contracts.

7

In *Duncan*, this court considered whether the defendant had presented a sufficient appellate record to show he did not waive his right to a jury trial, thus establishing a specific event had *not* occurred in the progression of the case. The court was satisfied the defendant met his obligation because the record established "a high probability" he never waived his right. 44 Kan. App. 2d at 1040-41. Here, we are concerned with the presence or absence of undue influence cultivated over time as Joyce interacted with Steven and others in the spring and summer of 2014. That's different from proving that a discrete event—like an express waiver of a constitutional right—never happened.

In *Frame* and *Cersovsky*, two of the more detailed discussions of undue influence claims involving contracts, the court gave no indication that something other than a preponderance standard would apply in rebutting the presumption of impropriety when the contracting parties had a confidential or fiduciary relationship. The discussion in *Wilkinson v. Cummings*, 194 Kan. 609, 611-12, 400 P.2d 729 (1965), and *Nelson v. Dague*, 194 Kan. 195, 198-99, 398 P.2d 268 (1965), among other cases, is of the same tenor. The *Nelson* court surveyed earlier opinions and cited none imposing a clear and convincing standard. 194 Kan. at 198.

We may draw from that body of law and its conspicuous silence on the burden of proof that the customary civil burden of a preponderance of the evidence governs. See *Grogan v. Garner*, 498 U.S. 279, 286, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991) (absent statutory directive, courts typically impose customary preponderance burden in civil proceedings and will consider doing otherwise only if "'particularly important individual interests or rights are at stake'") (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389-90, 103 S. Ct. 683, 74 L. Ed. 2d 548 [1983]); *In re Estate of Moore*, 53 Kan. App. 2d 667, 682, 390 P.3d 551 (2017) ("proof generally needed to rebut a presumption is a preponderance of the evidence"); *In re Marriage of Mullokandova and Kikirov*, No. 108,601, 2013 WL 5422358, at *3 (Kan. App. 2013) (unpublished opinion) ("The failure to mention the burden [of proof] strongly suggests it is the typical civil requirement of a

preponderance of the evidence."). The special relationship, then, shifts the burden of proof from the party seeking to rescind the contract to the party seeking its enforcement. But the special relationship does not enhance the burden.

Two of our early cases seem to mistakenly ascribe a clear and convincing evidence standard to a party seeking to enforce a contract made with someone for whom they acted as a fiduciary or in a confidential capacity. In *In re Estate of Relihan*, 4 Kan. App. 2d 277, 281, 604 P.2d 1219 (1980), the court simply stated the proponent of a real estate deed failed to overcome the presumption of undue influence by clear and convincing evidence without citing any authority for that proposition. The court more generally drew at some length from *Frame* for pertinent legal principles. As we have said, *Frame* articulates no such burden of proof, and the citations to and quotes from *Frame* in *In re Estate of Relihan* confirm as much. In *McConachie v. McConachie*, 1 Kan. App. 2d 12, 16, 561 P.2d 889 (1977), the court appears to endorse the district court's use of a clear and convincing standard in affirming a decision to set aside several deeds. The *McConachie* court also mistakenly relied on *Frame* as supporting authority.

In its memorandum decision, the district court recognized the legal principles governing the trust's claim for undue influence and expressly required Steven to prove the absence of undue influence over Joyce by a preponderance of the evidence. We find no error in that respect.

In *Moore I*, we pointed out that different legal principles govern will contests. If a will has been accepted for probate either because it is self-proved or because the witnesses to the testator's signature have testified, the party challenging the will may establish a presumption of undue influence by proving a confidential or fiduciary relationship between the testator and a legatee *and* suspicious circumstances infusing the disputed bequest. 56 Kan. App. 2d at 305-06; see *In re Estate of Haneberg*, 270 Kan. 365, 375, 14 P.3d 1088 (2000). The proof must be by clear and convincing evidence. 270

9

Kan. at 375. The burden then shifts to the legatee to rebut the presumption of undue influence by a preponderance of the evidence. See *Estate of Moore*, 53 Kan. App. 2d at 682-83. We surmised the more rigorous proof necessary to void a will derives from the prima facie showing of validity required to submit the document for probate in the first place combined with a strong policy preference for distributing a decedent's estate through a will rather than by intestate succession. *Moore I*, 56 Kan. App. 2d at 313-14. Here, we are concerned with a sales contract rather than a will or some other testamentary instrument.

*District Court's Factual Findings*

The district court's findings of fact present multiple problems that undercut how the district court then applied the correctly stated legal principles in reaching the final judgment for Steven and Jebediah. Some of the findings are simply narrative recitations of witness testimony that are discordant or outright in conflict. The district court did not make clear credibility findings resolving those inconsistencies. And several key findings lack support in the trial evidence.

A district court's findings entered following a civil bench trial should state the legally controlling facts established in the evidence. In other words, the district court ought to outline what it has determined actually happened insofar as those circumstances prove or disprove the disputed legal claims of the parties. *Hildenbrand v. Avignon Villa Homes Community Association, Inc.*, No. 120,245, 2021 WL 137339, at *8 (Kan. App. 2021) (unpublished opinion) ("In presenting findings of fact and conclusions of law . . . the district court is expected to evaluate the kaleidoscope of evidence and to enunciate the governing facts it has derived from that evaluation."). The product should reflect the district court's distillation of incomplete or conflicting evidence and typically should include credibility determinations when witnesses offer differing accounts of relevant events, recognizing that a given witness may be credible in some respects and not others.

10

See *State v. Franco*, 49 Kan. App. 2d 924, 930, 319 P.3d 551 (2014) (fact-finder at trial, there a jury, "may choose to believe parts of a given witness' account of relevant events and disbelieve other parts"). By the same token, findings of fact are not supposed to be a compendium of the trial evidence journalistically narrating the testimony of each witness and describing each admitted exhibit. See *Hildenbrand*, 2021 WL 137339, at *8. That sort of reportorial recitation has exceptionally limited value as a judicial tool in the first instance and especially on appellate review.

The district court's memorandum decision contains 53 paragraphs denominated as findings of fact spread over 12 pages. Many of the findings outline largely undisputed background information sketching a useful lead-up to what happened in the spring and summer of 2014. Some of the findings, of course, directly address the sale of John and Joyce's homestead to Jebediah in May 2104—a contract the trust sought to rescind in the district court. The district court ruled for Steven and Jebediah on that claim, and the trust has not appealed that part of the judgment. So those findings now have little direct relevance to the remaining issue.

As to the September 2014 contract for the sale of the farmland to Jebediah, the district court's findings of fact tend to slip into testimonial summaries ascribed to several principal witnesses, including Joyce, Steven, and Cashman. In its conclusions of law, the district court characterized "much of the testimony" about that transaction as being in conflict. The district court then stated it found "most significant the testimony of those [witnesses] with nothing to lose or gain" from the sale. The credibility of a witness having a direct personal or financial interest in the outcome of a legal dispute obviously may be questioned for that reason. See *State v. Scott*, 39 Kan. App. 2d 49, 56, 177 P.3d 972 (2008) ("One of the methods or techniques for attacking the credibility of a witness is to show partiality, including bias, motive, and interest in the outcome."). The district court, however, never identified just who, among the witnesses, fit in that disinterested category. Plainly, Joyce, Steven, and Jebediah did not. Likewise, John W., Sue, and

11

Wilma would not, since they were the trust beneficiaries designated to get the two tracts of farmland upon Joyce's death but for the sale to Jebediah.

When he testified during the trial, Cashman had a personal interest that arguably could have affected his credibility: His role in preparing the contract and presenting it to Joyce prompted her and the trust to sue his law firm for malpractice. The firm, in turn, wound up settling the claim, although the terms of the settlement are not readily apparent in the appellate record. We do not mean to suggest Cashman necessarily shaded his testimony. But he was not a disinterested observer of the relevant events. And the district court made no explicit finding crediting him as a witness.

The district court's disinterested witnesses may have included a banker who met with Joyce, Steven, and Jebediah during the summer to discuss possible options for financing a sale of the farmland. According to the banker, the upshot was that the net income from the farmland probably would be insufficient to cover the mortgage payments if it were sold at fair market value and the bulk of the purchase price were financed through a commercial lender. At trial, the banker recalled Joyce "was present but [had] very, very little input at all." He testified he had the "feeling" Joyce wanted the land to remain "in the family." Upon further questioning, he agreed that was a "guess" on his part based on conversations he had with John rather than anything Joyce said or did. The banker also acknowledged he had testified in a deposition that he had the "impression" Joyce wanted to sell the land to Jebediah. In its findings of fact, the district court characterized those feelings, guesses, and impressions as the banker having "understood" Joyce's actual intent and desire to sell the farmland to Jebediah at what would be less than fair market value, even though she never verbalized such sentiments. The district court alluded to that testimony in arriving at its ultimate legal conclusion.

During the trial, Cashman testified he met with Joyce, Steven, Steven's wife Joy, and Jebediah at his office in late August 2014. According to Cashman, Steven requested

and scheduled the meeting to discuss the sale of the two tracts of farmland. During the meeting, which lasted 20 to 30 minutes, Steven did most of the talking and outlined the terms of the sale to be included in the contract. There was no negotiation over the sale. Cashman did not recall Joyce asking questions or saying much of anything. Cashman testified that at the end of the meeting he asked Joyce if she understood the terms of the sale to be what Steven had stated and she said yes. Since Joyce had been sitting in the room, Cashman assumed she was listening to the discussion. At the trial, Joyce was not asked specifically about this meeting and did not offer an account of it.

Cashman testified that Joyce, Steven, and Jebediah returned on September 9 for a brief meeting to sign the contract of sale for the farmland. He and Joyce testified about this meeting. Joyce said she had not seen the written contract until then. Cashman recalled asking Joyce if she had any questions and she did not.

Cashman and Joyce agree that he never went over the contract with her, discussed the transaction with her in private, or explained that the sale left nothing in the trust to go to John W., Sue, or Wilma. The only remaining tract was to go to Steven. Cashman testified that he had been hired to draft an installment sales contract and not to advise Joyce about the trust or to prepare a new estate plan. In that circumstance, Cashman said he had not been retained to represent Joyce, so Joyce was not his client and he had no duty to explain the transaction to her.

In its conclusions of law, the district court described Cashman as "Joyce's attorney" and emphasized that he "did not find the terms of the contract so outrageous to cause concern." The description of Cashman is really more of a finding of fact, and it has no support in the trial record. Although Cashman had done legal and tax work for John and Joyce over the years, he unequivocally testified he did not represent her and was not looking out for her interests in the sale of the farmland. The trial record is silent as to whether he told Joyce as much or suggested she seek an outside assessment of the

13

transaction. We may not infer Cashman did so, and the district court made no such finding.

Independent advice to a contracting party selling land or other property may defuse the presumption of undue influence that arises when the buyer stands as a fiduciary or confidant to the seller. See *Frame*, 202 Kan. at 469; *Wilkinson*, 194 Kan. at 612. Steven has not argued Joyce received "independent advice" about selling the farmland to Jebediah. And the record confirms she did not.

In short, contrary to the district court's take, Cashman did not provide some check on the transaction designed to shield Joyce from Steven's overreaching or his exploitation of their fiduciary relationship. In that respect, the district court did recite among its legal conclusions Joyce's testimony that during the summer of 2014, Steven pressed her four or five times a week about selling the farmland to Jebediah. We suppose that mention signifies the district court's acceptance of Joyce's testimony in the absence of a finding of fact otherwise. The district court then concluded Joyce "finally relented" in the face of that persistent pressure. During the trial, Steven testified he raised the sale of the farmland with Joyce just twice.

The district court also gave what it characterized as "considerable weight" to Joyce's actions after she signed the contract selling the farmland and concluded her conduct belied the claim of undue influence. But the district court made an abbreviated review of those actions without any explanation for its approach.

The district court concluded that several weeks after the sale, Joyce called Cashman to ask if the contract could be modified so that any profit Jebediah might realize from his sale of the land in the next ten years would be shared with John W., Sue, and Wilma. Cashman testified he conveyed the request to Steven and never heard back from him. During the trial, Steven was not asked about any such communication from

14

Cashman. He did testify that Joyce expressed no dissatisfaction with the sale of the farmland until the end of the year. Joyce testified she called Cashman within several days to ask if the sale could be rescinded and Cashman told her no. The district court's conclusion conforms to Cashman's testimony and leaves out Joyce's account.

The district court offered no explanation for preferring Cashman's testimony over Joyce's on this point. But the district court concluded that since Joyce failed to promptly act to rescind the contract, she could not have been unduly influenced to enter it in the first place.

But the district court also made a finding of fact that following the September sale, Joyce modified the trust so that the only remaining tract would go to John W., Sue, and Wilma rather to Steven. She did so after her unsuccessful attempt either to rescind or to modify the contract of sale. The district court simply ignored its own finding in assessing Joyce's actions after the sale. The circumstances, as reflected in the district court's factual determinations, show Joyce took actions to reverse or mitigate the effects of the sale of the farmland on John W., Sue, and Wilma's interests as beneficiaries of the trust. And her actions were consistent with Cashman's failure to respond favorably to her request to rescind the sale (in her account) or to provide a portion of the profits from a resale of the land (in his account). The full findings fall short as a foundation for the district court's ultimate legal conclusion that Steven rebutted the presumption of undue influence.

*Conclusion*

We cannot credit the district court's ostensible finding that Cashman acted as Joyce's lawyer at least with respect to the sale of the farmland to Jebediah. There is simply no support in the trial record for that idea—the undisputed evidence is entirely to the contrary. No one independently advised Joyce about the implications of the transaction before she signed the contract. Similarly, the findings overstate the banker's

15

testimony about Joyce's ostensible intent beforehand and understate Joyce's efforts to undo the effects of the sale afterword. But other findings of the district court do establish circumstances indicative of undue influence:

• During the summer of 2014, Steven repeatedly impressed on Joyce the need to sell the farmland to Jebediah. He warned that otherwise John W., Sue, and Wilma could sell off the farm because he could not afford to buy the interests they would receive through the trust at fair market value.

• The sale of the farmland to Jebediah was on exceptionally favorable financial terms for him.

• The circumstances surrounding the preparation and signing of the sales contract in late August and early September 2014 show Steven largely orchestrated the transaction with Cashman preparing the contract and related documents at his direction.

• Steven had a fiduciary or confidential relationship with Joyce arising from his management of the farm and his handling of Joyce's personal finances and related matters. Joyce became even more dependent on Steven in those respects during John's final illness and after his death in May 2014. The district court noted that following John's death, Joyce "relied upon and trusted" Steven and that she was "distraught." Joyce never voiced assent or endorsement of the plan to sell the farmland to Jebediah. She sat essentially silent in the meeting with the banker and in the two meetings with Cashman. Joyce signed the contract when Cashman put it in front of her with Steven and Jebediah beside her.

• The sale effectively disinherited John W., Sue, and Wilma—Joyce and John's children other than Steven—by stripping the trust of the land that was to go to them upon

Joyce's death. Joyce had never signaled any indication, let alone a firm intention, she wished to deny them any significant inheritance in favor of Steven and Jebediah.

• Almost immediately after Joyce signed the sales contract, she contacted Cashman to mitigate the impact of the transaction on John W., Sue, and Wilma. When those efforts (whatever their precise scope) failed, Joyce amended the trust, so the last tract of land would go to them rather than to Steven.

Crediting the district court's findings that have substantial support in the trial evidence, we cannot say they provide the requisite foundation for the district court's legal conclusion that Steven and Jebediah rebutted the presumption of undue influence. We afford that legal conclusion no deference on appellate review. Two points loom large. First, the sale amounted to a radical alteration of the estate plan John and Joyce crafted through the trust, essentially disinheriting three of their children to the benefit of the fourth. See *Cresto*, 302 Kan. at 836-37 (in will contest, unexplained disinheritance of children likely suspicious circumstance indicative of undue influence). The change was not effectuated through a modification of the trust itself—a process that presumably would require Joyce's informed consent in conjunction with the drafting and approval of an amended trust document. Rather, it was done indirectly.

Second, the especially favorable terms on which Joyce sold the farmland to Jebediah suggest an overreach, given the special trust and confidence she had reposed in Steven. See *Frame*, 202 Kan. at 469-70 (where parties have a confidential relationship, adequacy of consideration in contract between them tends to dispel presumption of undue influence). Without going through the numbers again, Jebediah paid roughly one-fifth of the appraised value of the land, with Joyce effectively financing the sale by agreeing to receive monthly payments over 30 years at less than market interest.

17

As we explained in *Moore I*, the parties had a full and fair opportunity to present their evidence at the trial. 56 Kan. App. 2d at 325-26. Nothing would be gained now by remanding for a new trial. In turn, we have credited the district court's findings of fact supported in the evidence. No purpose would be served by remanding for additional findings. Assessing the legal import of those findings presents a question of law we can determine just as well as the district court. See *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 258-59, 261 P.3d 943 (2011) (legal effect of undisputed facts entails question of law). There is no good reason to send the case back for the district court to do what we can and should do ourselves.

The district court's creditable findings of fact do not support the legal conclusion embodied in its judgment for Steven and Jebediah. The findings fail to outline evidence sufficient to overcome the presumption of undue influence. In other words, Steven and Jebediah have not carried their burden of proof to establish that Joyce was not unduly influenced in selling the farmland in September 2014. The district court, therefore, should have entered judgment for the trust rescinding the contract. See *Moore I*, 56 Kan. App. 2d 301, Syl. ¶ 9 (rescission is appropriate equitable remedy when contract results from undue influence); 17B C.J.S. Contracts § 632.

Accordingly, we reverse and remand with directions that the district court enter judgment for the trust rescinding the September 2014 contract between Joyce and Jebediah and granting the trust any other equitable relief it has appropriately sought. The district court should enter an order requiring Jebediah to sign those documents, including a deed, necessary to restore the farmland to the trust and should determine the proper disposition of the payments Jebediah has made under the contract, the profits realized from the farming operation, and any other equitable considerations necessary to place the parties as nearly as possible in the positions they occupied immediately before the September 2014 sale. See *Hoffman v. Haug*, 242 Kan. 867, 871, 752 P.2d 124 (1988) (rescission restores parties to positions occupied before entering contract); *Dreiling v.*

18

*Home State Life Ins. Co.*, 213 Kan. 137, 147-48, 515 P.2d 757 (1973); 17B C.J.S. Contracts § 657.

Reversed and remanded with directions.