(203 P.3d 33)
No. 99,009

KANSAS HEALTH CARE STABILIZATION FUND, *Appellee*, v. ST. FRANCIS HOSPITAL, a/k/a VIA CHRISTI REGIONAL MEDICAL CENTER, INC., *Appellant*.

Opinion filed March 20, 2009.

*James D. Oliver*, of Foulston Siefkin, LLP, of Overland Park, and *Darrell E. Warta*, of the same firm, of Wichita, for appellant.

*Thomas D. Haney*, of Henson, Clark, Hutton, Mudrick & Gragson, LLP, of Topeka, for appellee.

Before RULON, C.J., GREENE and HILL, JJ.

GREENE, J.: St. Francis Hospital in Wichita, a/k/a Via Christi Regional Medical Center (Via Christi), appeals the district court's ruling based on summary judgment motions and a subsequent bench trial that the Kansas Health Care Stabilization Fund (Fund) had no liability to indemnify Via Christi for a settlement wherein Via Christi agreed to pay the Maria Brower family $3.3 million for a comprehensive release of all their claims, which arguably included medical malpractice, fraud, and spoliation of evidence. The district court held that to the extent the settlement included payment for covered injuries, that payment did not exceed Via Christi's self-insurance, thus triggering no liability of the Fund. We affirm the district court.

## Factual and Procedural Background

This litigation has a long and rather tortured factual and procedural history. In October 1987, Maria Brower, a minor, had surgery to remove a spinal tumor and to correct a spinal defect. Following the surgery, Brower suffered partial paralysis, including the loss of bowel and bladder control. Brower sued the surgeon in 1992, but the trial resulted in a defense verdict. Thereafter, the district court granted Brower a new trial based upon juror misconduct, and the surgeon then settled the suit with Brower for an undisclosed amount.

This settlement did not end Brower's litigation, however, because of alleged misconduct by Via Christi or its agents during the initial suit. The alleged misconduct in that litigation surrounded the production by Via Christi of two inconsistent printouts of the somatosensory-evoked potential (SSEP) monitoring during Brower's surgery. This alleged misconduct provoked Brower's 1996 suit against Via Christi and its electroencephalogram technician, Lisa Gould, alleging negligence in SSEP monitoring, fraud, spoliation of evidence, intentional infliction of emotional distress, and

violations of the Kansas Consumer Protection Act (KCPA). The suit prompted a letter from the Fund to counsel for Via Christi, stating:

"This Department has been advised by the insurance company that you have been appointed to represent the following defendant(s) whom they insure:

Via Christi Medical Center

"Our records show that the defendant(s) named above qualifies for coverage provided by the [Fund] pursuant to statute, K.S.A. 40-3401 et seq. In order that we can be kept apprised of the status of this matter, we ask that you provide us with the following information [including an estimate of liability and other information to enable evaluation of exposure of the Fund]."

In April 1997, the district court granted Via Christi's motion for partial summary judgment on the negligence claim based on the statute of repose. The court rejected Brower's argument that the statute of repose should be tolled as the result of allegedly fraudulent conduct by Via Christi and, in doing so, refused to follow the majority opinion of this court in *Robinson v. Shah*, 23 Kan. App. 2d 812, 936 P.2d 784 (1997), instead following the concurring and dissenting opinion in that case, 23 Kan. App. 2d at 833-36 (Knudson, J.).

Whether to appeal the district court's ruling then became the subject of consideration and discussion between the parties. From correspondence in the record, Via Christi's counsel reported to his client in early 1998 that Brower's response to a motion for summary judgment included a request for the court "to amend its previous ruling and allow for an interlocutory appeal" and stated an intention "to voluntarily dismiss all remaining claims, thereby allowing appeal of the court's earlier ruling." This letter suggested that Brower's counsel "wants in the worst way for the negligence issue to be immediately presented to the Kansas Court of Appeals."

In May 1998, an internal memo of Via Christi's counsel suggested that they were "still deliberating the possibilities of whether we should agree" to an immediate appeal regarding the negligence claim. The memo discussed the pros and cons of such an appeal, noting that a detriment would be the loss of some useful testimony concerning the equitable estoppel argument by Brower. The

memo reported no decision as to an agreement to an interlocutory appeal.

Sometime prior to July 1998, and purportedly due to a perceived conflict of interest created by the potential need for counsel to testify as to the fraud claim, Brower's counsel withdrew and new counsel entered his appearance. New counsel then moved to voluntarily dismiss the remaining claims in the case without prejudice. The record on appeal does not contain the motion, order, or transcript of ruling, but correspondence from Via Christi's counsel reported that in granting Brower's motion, the district court ruled "that all discovery conducted and the summary judgment rulings received would be applicable in any refiled action."

Later in 1998, Brower refiled her suit against Via Christi and Gould, alleging negligence, together with fraud and evidence spoliation, but deleting the intentional infliction of emotional distress and KCPA claims. Based on correspondence in the record, it appears that the Fund notified Via Christi in late December 1998 that the claims asserted "were based upon fraud and intentional tort and that [the Fund] hoped that coverage did not become an issue."

In May 2000, the Fund's chief attorney questioned its potential liability in a letter to Via Christi's counsel and inquired whether there were any claims being made against Via Christi for negligence. In response, Via Christi's counsel stated:

"You are correct that the original petition contained five claims: Negligence, spoliation, fraud, intentional inflection [*sic*] of emotional distress and consumer protection violations. The last two listed claims were dropped when the case was dismissed and refiled. *Summary judgment has been entered against the negligence claim.* Therefore, at the moment, the only surviving claims are for spoliation and fraud. However, plaintiffs will likely appeal, and may even seek rehearing, on the order holding that the negligence claim was barred by the statute of repose.

"The bottom line response to your letter, therefore, is that at present the only surviving claims are for fraud and spoliation, but *there is a negligence claim waiting in the wings.* As to the fraud and spoliation cases, they both arise out of the providing of medical services and allege as damages injuries arising out of alleged medical malpractice. Obviously it would not be appropriate for me, as defense counsel, to offer an opinion as to whether the Fund has coverage under these circumstances." (Emphasis added.)

On August 15, 2001, Via Christi formally tendered its liability limits to the Fund and requested the Fund to assume the defense of the litigation. The Fund responded to Via Christi by letter, stating: "In the event that it is determined that the Health Care Stabilization Fund has coverage in this matter, the tender will be accepted as of August 16th, the date your letter was received in our office. At this time, however, we do not accept nor deny the tender."

In late 2001, trial counsel for both Via Christi and Gould wrote letters to the hospital's counsel, indicating bleak predictions for the potential liability Via Christi faced if the jury awarded Brower damages. Following additional negotiations with Brower, Via Christi ultimately settled the suit for $3.3 million in a confidential settlement agreement on June 7, 2002. The Fund did not participate in the settlement. The settlement agreement contained a provision which stated in material part:

"All sums set forth in this Settlement Agreement and Release constitute damages on account of personal injuries or sickness in a case involving physical injury or sickness arising from the accident, casualty or event stated in Paragraph 1 of this agreement and within the meaning of Sections 104(a)(2) and 130(c) of the Internal Revenue Code of 1986, as amended."

On July 16, 2002, Via Christi advised the Fund of the settlement and requested contribution in the amount of $3 million and requested payment of attorney fees for its defense costs. On July 26, 2002, the Fund noted its disagreement that it was obligated to contribute to the settlement or pay for Via Christi's defense costs. Five days later, the Fund filed a declaratory judgment action in Shawnee County seeking judgment that it had no coverage and thus no obligation to reimburse Via Christi for the settlement. Via Christi filed a counterclaim alleging wrongful denial of coverage for the settlement.

On September 21, 2004, the parties filed joint stipulations of fact, which the district court accepted. Thereafter, each party filed competing motions for summary judgment. The district court held that the Fund covered any of the claims contained in the settlement "arising out of the rendering or failure to render professional services" by Via Christi but did not cover any other claims settled. The

court further reasoned that, since the nature of the fraud claim did not involve improper medical treatment but occurred *subsequent* to the medical treatment, the fraud claim was not covered by the Fund. Because the court could not apportion the settlement according to the claims resolved, it ordered the parties into mediation to attempt to reach agreement on the amount owed by the Fund.

The Fund filed a motion for rehearing or modification of the memorandum decision, arguing that Gould was not covered by the Fund and that her negligence would not be covered by the Fund. The district court rejected the Fund's argument, noting that Via Christi was covered by the Fund and Gould's negligence could be attributed to Via Christi under a theory of respondeat superior.

When the parties failed to reach an agreement pursuant to the court-ordered mediation, the district court conducted a bench trial on the issue of apportioning the settlement between covered and noncovered injuries. On June 7, 2007, the district court concluded that less than $200,000 of the $3.3 million settlement in the Brower case was paid to eliminate the remote possibility that a negligence claim might be revived at some unknown date in the future. Because Via Christi was self-insured for the first $200,000 of liability, the court granted judgment against Via Christi on its counterclaim.

Via Christi filed a timely notice of appeal from the district court's judgment.

Prior to oral argument before this court, we issued an order for supplemental briefing to address the legal impact of the voluntary dismissal without prejudice after the summary judgment ruling on the negligence claim. The parties filed and we have now considered the supplemental briefing on this issue.

### Is the Issue of the Fund's Duty to Defend Properly Before this Court?

On appeal, Via Christi principally contends that the Fund had a duty to defend Via Christi on a potential negligence claim and, because the Fund breached that duty, the Fund cannot now contest the reasonableness of Via Christi's settlement with Brower absent some demonstration of fraud or collusion. Although this legal construct might ordinarily have validity, Via Christi has never al-

leged the Fund breached a duty to defend. Instead, Via Christi's entire case in district court focused on allegations that the Fund breached a duty to indemnify. In other words, our review of pleadings and summary judgment motions reveals this was merely a coverage battle, without the complications and legal consequences inherent in litigation alleging breach of the duty to defend.

Via Christi did not raise any issue of the Fund's duty to defend until appeal. The issues framed by the initial pleadings and the summary judgment motions were limited to coverage, and we view this question as quite distinct from the broader duty to defend. Our Supreme Court recently discussed the distinction in these duties:

" 'As between the duty to pay proceeds and the duty to defend, the more expansive, broader duty is the duty to defend. The source of this observation is in the fact that an insurer is contractually obligated to defend even meritless suits that fall within the coverage. Presumably, the plaintiff's claims in meritless suits will be defeated, and the insurer will therefore not incur any obligation to provide indemnification. But before the merits are decided, the insurer must provide and pay for the insured's defense. In effect, the insured receives "coverage" for the defense itself, even though no duty to indemnify will ever exist in that situation. In other words, the duty to defend is broader in the sense that it is triggered in more situations than the duty to indemnify.' [Citation omitted.]" *Miller v. Westport Ins. Corp.*, 288 Kan. 27, 33, 200 P.3d 419 (2009).

Contrasting Via Christi's summary judgment motion to its brief on appeal, it is clear that the issue presented to the district court did not encompass the broader duty to defend now argued on appeal. The summary judgment motion framed only the following as the question presented:

"Should Via Christi be denied its insurance coverage with the Fund simply because the Browers' claims included allegations of fraud and spoliation of evidence, in addition to allegations of medical negligence, all of which arose out of Maria Brower's surgery and other related medical care?"

The brief on appeal suggests that "[w]hen an excess liability insurer has denied coverage and *refused to defend* a covered claim, it is bound by the insured's settlement of the claim unless it proves the settlement was fraudulent or collusive." (Emphasis added.) The

brief goes on to provide tenets applicable to the duty to defend, including the duty to defend even though the possibility of coverage may be remote.

Here, the district court was not asked, and the parties had not pleaded, that there was a duty on the part of the Fund to defend Via Christi. Instead, the focus was unequivocally on the question of coverage after the settlement. Via Christi's attempt to shift its theory on appeal would dramatically alter our approach and the applicable legal principles on review; we are not inclined to permit such a shift.

Indeed, the district court noted the distinction between the duty to defend and the duty to indemnify and ultimately focused on "the underlying facts as they existed when the claim was settled and [made] the determination as to whether the incident [fell] within coverage." Accordingly, we decline to decide this appeal on this issue, instead focusing on the issues that were framed by the summary judgment motions to the district court. See *Miller v. Bartle*, 283 Kan. 108, 119, 150 P.3d 1282 (2007) (issues not raised before the trial court cannot be raised on appeal).

We revisit the district court's rulings to ascertain the scope of this appeal. The district court held that the motions for summary judgment were limited to two specific issues:

"1. Whether any or all of the settlement in Sedgwick County Case No. 98-C-3467 was for claims 'arising out of the rendering of or the failure to render professional services' pursuant to K.S.A. 40-3403(c)(1); and,

"2. Whether the Kansas Health Care Stabilization Fund is obligated to pay any or all of the settlement in Sedgwick County Case No. 98-C-3467 pursuant to K.S.A. 40-3403(c)(1)."

Our extensive analysis of the summary judgment motions and supporting memoranda reveals that these were the only issues framed below, and the district court's resolution of these issues led to the necessity of a bench trial on the issue of apportionment of the settlement. Accordingly, we limit our decision to these issues, reviewing the district court's findings and conclusions on each.

### *Did the District Court Properly Construe and Apply the Phrase "Arising Out of the Rendering of or Failure to Render Professional Services" Contained Within K.S.A. 40-3403(c)(1)?*

Via Christi argues that the district court erred in construing and applying K.S.A. 40-3403(c), which provides:

"Subject to subsections (d), (e), (f), (I), (k), (m), (n), (o), (p) and (q), the fund shall be liable to pay: (1) Any amount due from a judgment or settlement which is in excess of the basic coverage liability of all liable resident health care providers or resident self-insurers for any personal injury or death arising out of the rendering of or the failure to render professional services within or without this state."

The interpretation of a statute is a question of law over which an appellate court has unlimited review. We are not bound by the trial court's interpretation. *LSF Franchise REO I v. Emporia Restaurants, Inc.*, 283 Kan. 13, 19, 152 P.3d 34 (2007).

The district court's memorandum decision reviewed the legislative history of the enactment and concluded the Health Care Provider Insurance Availability Act "must be interpreted for the benefit of all Kansans in order to promote the purpose and to protect the financial integrity of the Health Care Stabilization Fund." Relying on *Bell v. Simon*, 246 Kan. 473, 790 P.2d 925 (1990), the district court then held that " 'K.S.A. 40-3403(c) must be read in harmony with the entire Act.' " The court found the language of that statutory provision to be clear and unambiguous and concluded that claims which do not arise out of the rendering of or failure to render professional services by a health care provider are not within the coverage of the Fund. Because the claims against Via Christi arose from Gould's intentional and fraudulent conduct in concealing and altering evidence, the court concluded they arose out of fraudulent conduct committed subsequent to the rendering of or failure to render professional services and were not within the coverage of the Fund under K.S.A. 40-3403(c).

At the outset, we fundamentally disagree with the district court's reading of the statute. The subject phrase "arising out of" does not modify claims, but rather it modifies "any personal injury or death." In fact, the statutory provision makes no reference to claims. In

other words, K.S.A. 40-3403(c) provides that the Fund is liable to pay any excess amount from a settlement "for any personal injury or death arising out of the rendering of or the failure to render professional services." The district court's reading is not supported by the clear language of the provision. See *Wilson v. Ramirez*, 269 Kan. 371, 381, 2 P.3d 778 (2000) (quoting with approval that district court's order and analysis as to Fund coverage).

Thus, the question framed is whether the Brower settlement was paid for personal injury arising out of the rendering of or the failure to render professional services. Via Christi argues that the settlement arose out of the rendering of such services. It suggests:

"If there had been no negligence in rendering professional services, there would be no damages. The damages claimed by plaintiff were the same on both the negligence and fraud theories. The effect of the fraud theory was to prevent Brower being deprived of a remedy for the damages arising out of negligence in the professional services rendered during her spine surgery."

We disagree. What injuries were suffered by Brower as a direct result of the alleged fraud and spoliation of evidence? Her injury was the *loss* of her ability to timely seek redress for the negligence of Gould, *not* the injuries sustained by reason of Gould's negligence. The measure of damages for the fraud claim may well have been the amount Brower would have recovered on a negligence claim, if the alleged fraud had not prevented her from bringing the action within the period established by the statute of repose. But the *injury* to Brower as the result of Via Christi's fraud, *i.e.*, the loss of her cause of action sounding is medical malpractice due to the operation of the statute of repose, does not arise out of the rendering of or the failure to render professional services.

The rather subtle distinction between the measure of damages in the fraud case and the injuries that arise from such a case is best explained by our court in *Robinson*. There, in addressing statute of limitations issues for claims of negligence and fraud against a health care provider, the court carefully distinguished between the claims as follows:

"We hold that where a patient has a cause of action against a physician for malpractice and has been duped by the intentional and knowing lies of the physician to the extent the patient in reliance on the fraudulent misrepresentation

permits the statute of limitations to bar his or her action, *the patient can maintain an action for fraud against the physician, not on account of the original negligence or malpractice but on account of the fraudulent actions of the physician* which deceived the patient with the consequence that the time bar ran against the original action." (Emphasis added.) 23 Kan. App. 2d at 824.

Another panel of our court recently quoted *Robinson* and characterized its holding as follows:

"[T]he holding of *Robinson* . . . requires a plaintiff to establish two separate instances of misconduct: one forming the original cause of action and the other in concealing or misrepresenting the facts that would allow the plaintiff, exercising reasonable diligence, to detect the underlying tortious conduct." *Bonura v. Sifers,* 39 Kan. App. 2d 617, 632, 181 P.3d 1277, *rev. denied* 286 Kan. 1176 (2008).

Although neither of these cases addresses the precise question before us, these cases instruct that a fraud case based upon conduct that conceals a negligence action until the statute of limitations or statute of repose has run must be viewed as separate and distinct from the underlying negligence action. In fact, to the extent that the elements of the actions are merged as suggested by Via Christi herein, the analytical framework for application of the statute of limitations becomes unworkable. Viewing the claims separately, the injury sustained by reason of the fraud is the loss of opportunity to litigate the negligence claim within the statute of limitations or statute of repose. The measure of damages in that fraud case is the potential recovery if the negligence case had proceeded on a timely basis. Clearly, however, the injury for the fraud does not arise from the rendering of professional services.

Via Christi relies on cases that have liberally construed the phrase "arising out of," including *Pestock v. State Farm Auto Ins. Co.*, 9 Kan. App. 2d 188, 189, 674 P.2d 1062 (1984). These cases, however, ultimately concluded the insurers did not owe liability for the accidents, noting the remoteness of the causal relationship between the injuries and types of activity covered by the respective policies.

The more instructive authority is *Garrison v. State Farm Mut. Auto. Ins. Co.*, 258 Kan. 547, 907 P.2d 891 (1995), where the question was whether an accident "arose out of ownership or use" of a motor vehicle. The court held that in order for coverage to exist

for accidental bodily injury caused by the discharge of a firearm within an automobile, there is no requirement that the vehicle be either the proximate cause of the injury or physically contribute to the discharge of the gun. "Coverage exists where the minimal causal connection between the use of the vehicle and the injury is provided by the foreseeable and reasonable use of the vehicle for hunting. [Citation omitted.]" 258 Kan. at 551-52.

While the holding of *Garrison* broadly construed a contract provision similar to the statutory provision at issue in this case, the court in *Garrison* clearly required a causal connection between the injuries and the conduct covered by the insurance provision. See *Molitor v. Davidson*, 26 Kan. App. 2d 83, 85-87, 978 P.2d 294, *rev. denied* 267 Kan. 889 (1999) (construing and not extending the holding of *Garrison*). Via Christi does not argue that fraud is a natural and foreseeable aspect of the professional services provided to the plaintiff; thus, the rationale of *Garrison* would not support Via Christi's argument to abandon a causal connection in construing the phrase "arising out of."

Under the facts of this case, Brower's allegations of fraud and spoliation of evidence against Via Christi and Gould did not arise out of the rendering of or the failure to render professional services. The district court properly held that the Fund's coverage did not include Brower's injury due to the fraud and spoliation of evidence. To the extent the settlement paid Brower sums for having lost her medical malpractice action due to the operation of the statute of repose, the Fund was not liable. This does not resolve this appeal; we must now examine whether the settlement also paid Brower for injuries that arose from any aspect of her original medical malpractice claims.

### Did the Brower Settlement Include Payment for Injuries that Arose From the Original Negligence Claims Against Via Christi?

Even though we have concluded that the Fund had no liability for settlement amounts paid for Brower's injuries due to fraud, Via Christi argues that the original negligence or malpractice claims remained in the suit at the time of settlement and that the settle-

ment amount included payment for Brower's injuries arising out of the rendering of professional services. Via Christi argues the negligence claim was improperly dismissed by the district court and this decision was never appealed; thus, the negligence claim was alive, pled in the subsequent action, included in the pretrial order, and acknowledged by counsel as "waiting in the wings." The Fund argues that the settlement did not include any payment for the negligence claims and, to the extent any such claims were included, Via Christi failed to shoulder its burden to demonstrate any basis for apportioning the amount paid among negligence claims, fraud claims, and punitive damage claims.

The district court initially determined that the negligence claims "could have been revived at any point prior to the entry of the final judgment" but "no attempt was ever made to allocate or itemize the settlement based on the type of claim asserted." When the parties were unable to come to an agreement as to an apportionment of the settlement amount, the district court conducted a bench trial and made factual findings to support its conclusion that "less than $200,000 of the $3.3 million settlement in the Brower case was paid to eliminate the remote possibility that a negligence claim might be revived at some unknown date in the future."

### What impact did the dismissal without prejudice have on the summary judgment terminating the negligence claim?

Upon this court's initial review, we perceived a threshold issue that must be resolved: Was the negligence claim subject to revival in a subsequent action after its termination by summary judgment was not appealed before the entire initial suit was dismissed without prejudice? Put another way: Did the dismissal without prejudice after summary judgment was entered on the negligence claim have a preclusive effect on any subsequent attempt to assert the claim? As indicated above, the parties were requested to submit supplemental briefs on this issue because both parties' initial briefs seemed to concede (and the district court seemed to believe) that the claim was unaffected by the dismissal after summary judgment.

Our initial concern was based upon this court's opinion in *Grimmett v. S&W Auto Sales Co.*, 26 Kan. App. 2d 482, Syl. ¶ 4, 988

P.2d 755 (1999), wherein a panel of our court held that preclusion doctrines should be applied when a party voluntarily dismisses a case after an adverse ruling has been made on a summary judgment motion. The rationale of the court was that "[s]ummary judgment procedure, at least from the defendant's point of view, would become a virtual nullity if plaintiffs could obtain 'overs' by dismissing and refiling a case rather than fully litigating an adverse summary judgment decision through the appellate process. [Citation omitted.]" 26 Kan. App. 2d at 486. The precise holding was stated by the panel as follows:

"We conclude a trial court's decision on summary judgment satisfies the final judgment on the merits requirement for purposes of claim preclusion when the parties were fully heard, the decision is made with a reasoned opinion, and the ruling is subject to appeal or, in fact, reviewed on appeal. [Citations omitted.] Although interlocutory when rendered, the trial court's decision became final when the appeal was dismissed." 26 Kan. App. 2d at 488.

If we apply this rule here, the summary judgment terminating Brower's negligence claim in the first Brower case would have preclusive effect and that claim could not have been any part of the remaining litigation as a matter of law.

Via Christi argues in its supplemental brief, however, that this application is of no value in this case. The argument is that whatever preclusive effect there may have been by virtue of the dismissal, there was no affirmative defense raised on this basis by St. Francis/Via Christi in the second Bower case. See K.S.A. 60-208(c). Absent any such pleading, the defense was waived. *In re Parentage of Shade*, 34 Kan. App. 2d 895, 903-04, 126 P.3d 445, *rev. denied* 281 Kan. 1378 (2006).

We agree with this assertion and therefore conclude that the negligence claim was not precluded as a matter of law from being asserted in the second Brower litigation.

## *Did the district court err in concluding that any payment to Brower for release of the negligence claim did not exceed the self-insured's coverage?*

Having determined that the settlement may have included payment for both covered and noncovered injuries, the district court

conducted a bench trial on the question of apportionment. We review the findings of fact to determine if they are supported by substantial competent evidence and are sufficient to support the trial court's conclusions of law. Substantial evidence is such legal and relevant evidence as a reasonable person might regard as sufficient to support a conclusion. An appellate court has unlimited review of the trial court's conclusions of law. *LSF Franchise REO I*, 283 Kan. at 19.

First, we examine the legal predicate for the bench trial. Was apportionment of the relative risks of covered and noncovered aspects of settlement the proper question, and, if so, was it a fact question? The district court relied principally on federal authorities in deciding its course and direction, by stating:

" 'Although the duty to defend is determined by the allegations of the underlying complaint and by facts discoverable to the insurer, the duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means (e.g. summary judgment or settlement).' *Bankwest v. Fidelity & Deposit Co. of Maryland*, 63 F.3d 974, 978 (10th Cir. 1995). See also *American Motorists Insurance Co. v. General Host Corp.*, 946 F.2d 1489, 1490 (10th Cir. 1991). When a lawsuit is settled, 'the duty to indemnify is determined from the facts forming the basis of the settlement.' *Employers Reinsurance Corp. v. New Cap Ins. Co.*, 209 F. Supp.2d 1184, 1192 (D. Kan. 2002). Thus, in the present case, 'the Court must assess the underlying facts as they existed when the claim was settled and make the determination as to whether the incident falls within the coverage . . . .' *Employers Reinsurance Corporation v. Newcap Insurance Company*, 209 F. Supp.2d 1184, 1192 (D. Kan. 2002).' "

Although Kansas law is scarce on the proposition, our Supreme Court quoted with apparent approval a district court's statement of similar principles in *AT&SF Ry. Co. v. Stonewall Ins. Co.*, 275 Kan. 698, 740-41, 71 P.3d 1097(2003), where the district court stated the principles as follows:

" '. . . [C]ourts applying Kansas law have held that when liability issues have been tried or settled, coverage issues are "controlled" by the settlement in the underlying litigation. The general rule is that "the duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means." [Citation omitted.]'

" 'After a settlement, the underlying claimants' liability contentions are accepted as true for purposes of determining whether there is coverage. [Citation omitted].' "

These principles appear to be fully supported by at least one learned treatise on insurance law. An excellent discussion of the precise problem faced by the district court appears in 1 Windt, Insurance Claims and Disputes § 6.31, pp. 6-244 to 6-250 (5th ed. 2007):

"Following a settlement as to which the insurer denies coverage, the existence of coverage should depend on what claims were settled; that is, it should depend on why the money was paid. The actual merit of each of the plaintiff's claims against the insured is not directly relevant. The only question should be how the parties to the settlement viewed the relative merits of the plaintiff's claims at the time of the settlement and whether, if the insured settled without the carrier's approval, the settlement amount was reasonable. Neither the insurer nor the insured should be allowed to try the plaintiff's claim in the coverage suit. The insurer should not, however, be bound by how the settlement is allocated by the insured/claimant or by what the agreement states is the reason the settlement money was paid."

Obviously, the question is one of fact, not one of law. Especially where the determination of coverage is compounded by a comprehensive settlement of both covered and noncovered injuries, the question turns on how the lead players valued the relative risks in arriving at the final settlement. See *Cyprus Amax Minerals v. Lexington Ins.*, 74 P.3d 294, 301-02 (Colo. 2003) (determination of whether a duty to indemnify exists requires factual development, as it is largely a question of fact).

Accordingly, we conclude the district court's conduct of a bench trial to address the ultimate issue here was quite appropriate, and the court's focus appears to have been consistent with sound principles of law. We must, however, determine whether the court's findings were supported by substantial competent evidence.

The district court's findings consist of 62 separately numbered paragraphs and its conclusions based on those findings are summarized in 5 pages of its final memorandum opinion. Both the findings and the conclusions include a comprehensive chronological itemization of evidence that the parties used to evaluate all the respective risks faced by reason of Brower's litigation during the time period March 21, 2001, and final achievement of settlement in July 2002. The findings are supported by the record evidence,

and the ultimate conclusions of the court can be summarized as follows:

1. Given the procedural posture of the case, the only way for plaintiff to have prevailed on her negligence claim would have required trial on the fraud claim, appeal thereafter challenging the old summary judgment, reversal of that judgment by the appellate courts, and a new trial thereafter. Revival of the negligence claim was remote at best, both in time and in likelihood of success.

2. Via Christi faced substantial risk on the fraud claims at the time of settlement, and defense counsel strongly believed the trial judge would impose up to $5 million in punitive damages.

3. Although there was a remote possibility of a negligence claim "waiting in the wings" at the time of settlement, the amount of the settlement was based not on that remote possibility, but on eliminating exposure of an "extremely high" verdict being returned on the fraud and spoliation of evidence claim.

4. In an 11th-hour memo to the executive committee of the hospital, its general counsel advised it was facing trial in "an extremely difficult and dangerous case" that was "based in fraud" and could result in punitive damages. He assessed the hospital's exposure at $7 to $10 million *plus* punitive damages.

We recognize that Via Christi views the risks somewhat differently from what the district court found. The Via Christi lawyers may well have held strong views about the vulnerability of the district court's summary judgment barring the negligence claim and its likelihood of being reversed on appeal. Likewise, they may have believed their knowledge was superior to that of the Fund's counsel on many of the questions bearing on risk valuation. Nevertheless, it is not our function to reweigh evidence, evaluate witnesses' credibility, or redetermine questions of fact; our task ends at the determination whether there is substantial competent evidence to support the district court's fact findings. *LSF Franchise REO I v. Emporia Restaurants, Inc.*, 283 Kan. 13, 19, 152 P.3d 34 (2007).

After an extensive review of the district court's findings and conclusions, together with the transcript of the bench trial, we are satisfied that the district court's findings are supported by substantial competent evidence and they adequately support the district

court's conclusion of law that less than $200,000 of the $3.3 million settlement was paid to eliminate the remote possibility that a negligence claim might be revived at some unknown date in the future. Because Via Christi was self-insured for $200,000, the excess liability coverage of the Fund was not triggered, and the Fund was entitled to judgment on Via Christi's counterclaim.

Affirmed.