No. 120,345

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STORMONT-VAIL HEALTHCARE, INC. and
COTTON O'NEIL CLINIC,
*Appellants*,

v.

BOARD OF COUNTY COMMISSIONERS FOR SHAWNEE COUNTY, KANSAS,
and CITY OF TOPEKA, KANSAS,
*Appellees*.

SYLLABUS BY THE COURT

1.

Under K.S.A. 22-4612, "custody" includes both formal arrest and detention that is the functional equivalent of an arrest in the sense a person would not be free to leave or feel free to leave.

2.

In a coordinated police action involving multiple law enforcement agencies, the agency with "operational control" has the obligation under K.S.A. 22-4612 to pay for medical treatment requested during the action for an injured person taken into custody. The determination of the agency with operational control should be based on the totality of the circumstances.

Appeal from Shawnee District Court; RICHARD D. ANDERSON, judge. Opinion filed December 11, 2020. Affirmed.

*Jennifer Martin Smith*, of Alderson, Alderson, Conklin, Crow & Slinkard, L.L.C., of Topeka, for appellants.

1

*James M. Crowl*, county counselor, and *Joni C. Thadani*, assistant county counselor, for appellee Board of Shawnee County Commissioners.

*Shelly Starr*, chief of litigation, city legal department, for appellee City of Topeka.

Before STANDRIDGE, P.J., ATCHESON, J., and BURGESS, S.J.

ATCHESON, J.: In a bench trial, the Shawnee County District Court found that the Kansas Highway Patrol exercised operational control over the coordinated efforts of three law enforcement agencies to apprehend a suspected felon and, therefore, was statutorily responsible for the cost of medical treatment provided to the suspect for injuries he suffered when he was taken into custody. The healthcare providers have appealed and argue the proper test is direct physical control of the suspect that would place the payment obligation on the City of Topeka, Shawnee County, or possibly both. The district court correctly applied K.S.A. 22-4612 to these circumstances involving the interlocking actions of multiple law enforcement agencies. We, therefore, affirm the district court's judgment imposing no liability on the City of Topeka and Shawnee County for the medical expenses. The Kansas Highway Patrol is not an active party to this litigation, so the healthcare providers cannot recover from a governmental entity under K.S.A. 22-4612.

## FACTUAL AND PROCEDURAL HISTORY

We sketch the salient facts without the adornment of irrelevant, if otherwise colorful, details. Jesse Dimmick, the suspected felon, had taken flight from Colorado, where he was wanted in connection with a murder, and stole a minivan in Geary County the morning of September 12, 2009, prompting a hot pursuit involving several Highway Patrol Troopers and at least one Geary County Sheriff's deputy. Dimmick headed east on I-70 and left the highway in rural Shawnee County, near the unincorporated community of Dover. By then, the Geary County Sheriff's personnel had yielded the chase to the

Highway Patrol. Aware of the chase, several Topeka Police officers and Shawnee County Sheriff's deputies deployed along Dimmick's anticipated eastbound route.

At some point, Dimmick drove the minivan over stop-sticks, heavily damaging the tires. Dimmick abandoned the vehicle and entered a house in the Dover vicinity. After Dimmick holed-up in the house with the couple who lived there as his hostages, Highway Patrol Troopers, Shawnee County Sheriff's deputies, and City of Topeka police officers converged on the scene to form what has been described as a "response team."

Shortly after 9 a.m., a Highway Patrol trooper was the first to arrive at the minivan Dimmick had abandoned in front of the house. He was followed in short order by two Shawnee County Sheriff's deputies. They began looking for Dimmick in the immediate area. Highway Patrol Lieutenant Dan McCollum requested K-9 teams from both the Shawnee County Sheriff and the Topeka Police Department to assist in the search. The officers quickly determined that Dimmick had gone into the house.

In its memorandum decision, the district court identified five Highway Patrol troopers, seven Shawnee County Sheriff's deputies, and three Topeka police officers all of whom arrived at the house within minutes. In response to a question from the ranking Topeka police officer, Lt. McCollum stated he was in charge of the scene. He identified himself at least several times as the scene commander. A short time later, Lt. McCollum requested an ambulance be dispatched as a precaution, since Dimmick was considered armed and dangerous and had two hostages. Members of a Topeka Police Department unit trained in handling hostage situations and extractions of armed suspects from buildings came to the scene.

Kansas Highway Patrol Major Mark Goodloe arrived and set up a "command post" at a nearby church. Shortly afterward, at the Highway Patrol's request, the Shawnee County Sheriff's Department sent a SWAT team, similar to the Topeka Police

3

Department unit, to the house. Major Goodloe then met with supervisors from both the Shawnee County Sheriff's Department and the Topeka Police Department to brief them on the operation. Ranking members of those departments also coordinated their intervention teams and other personnel.

An exhausted Dimmick apparently dozed off about 11 a.m., and the couple escaped from the house. They informed a Topeka Police detective that Dimmick had a knife and had fallen asleep in one of the bedrooms.

About 10 minutes later, Major Goodloe authorized an immediate entry of the house to capture Dimmick. He was concerned that Dimmick might find a shotgun the couple had stored in the house. Shawnee County Sheriff's deputies and Topeka Police Department officers conferred on a coordinated tactical plan to implement the directive. Members of the composite response team then went in and took Dimmick into custody.

As Dimmick was lying prone in a hallway adjacent to one of the bedrooms, a Shawnee County Sheriff's deputy prepared to handcuff him. A sergeant with the Topeka Police Department had a rifle trained on Dimmick. The sergeant perceived Dimmick to be moving as if to avoid being handcuffed, so he stepped on Dimmick's right arm and ordered him to stop. As the sergeant did so, his rifle accidently discharged. The shot struck Dimmick in the back. The sergeant then immediately requested medical assistance—the ambulance on standby responded within a minute or two. The ambulance crew, accompanied by a Shawnee County Sheriff's deputy, transported Dimmick to Stormont-Vail Hospital, where he had surgery and was treated through September 29.

After Dimmick's capture, Major Goodloe directed all of the law enforcement officers to report to a nearby fire station to document their presence and the times of their arrival. Agents with the Kansas Bureau of Investigation assumed control of the investigation going forward, including possible criminal charges against Dimmick and

4

the precise circumstances surrounding his injury. Several Shawnee County Sheriff's deputies assisted in photographing the scene and otherwise documenting physical evidence. By 3:30 p.m., only KBI agents and Highway Patrol troopers remained at the scene. Lt. McCollum stayed until just after 5 p.m. and was the last officer to leave after the disabled minivan had been towed.

A KBI agent, a Highway Patrol trooper, and at least a couple of Shawnee County Sheriff's deputies initially were at the hospital and remained there while Dimmick underwent surgery. The KBI agent took custody of relevant physical evidence, such as Dimmick's clothing. At the hospital, Dimmick was physically restrained and under guard throughout his stay. He was charged with three serious felonies and several misdemeanors in Shawnee County District Court and was convicted of some of the felonies and misdemeanors in 2010.

Plaintiffs Stormont-Vail Healthcare, Inc. and Cotton-O'Neil Clinic filed this action in the district court in 2012 against the City of Topeka and Shawnee County to recover the cost of the medical care they provided to Dimmick. Throughout this case, the plaintiffs have been united in interest and have shared legal representation; we, therefore, have no need to distinguish between them and refer to them jointly as Stormont-Vail. They have sought just over $41,700 for the medical care and treatment between September 12 and September 28.[*]

[*]Stormont-Vail also sued for payment of about $844 for follow-up care provided Dimmick in late October and late November 2009 while he was being held in the Shawnee County jail awaiting trial on the criminal charges. Shawnee County has conceded liability for that amount, and the district court entered judgment accordingly for Stormont-Vail. Given its concession, Shawnee County has not cross-appealed that ruling.

Before filing this action, Stormont-Vail submitted written requests and more formal administrative demands for payment to the State, Shawnee County, and the City of Topeka. In the materials seeking payment from the State, Stormont-Vail asserted the State was responsible under K.S.A. 22-4612 based on the Highway Patrol's actions in

5

apprehending Dimmick. We attach no direct legal significance to those demands in deciding this appeal. They do not in some fashion preclude Stormont-Vail's arguments that the district court erred in finding the Highway Patrol responsible.

Stormont-Vail, Shawnee County, and the City of Topeka all filed motions for summary judgment and submitted a stipulation of facts to the district court. The district court entered summary judgment for Stormont-Vail against Shawnee County. The County appealed. We reversed and remanded that decision in 2016 because the undisputed facts were insufficient to support summary judgment against Shawnee County and the district court impermissibly drew inferences to reach that result. *Stormont-Vail Healthcare v. Board of Shawnee County Comm'rs* (*Stormont-Vail I*), No. 112,811, 2016 WL 2772859, at *1 (Kan. App. 2016) (unpublished opinion). We return to that decision in our discussion of the governing law.

After the remand, Stormont-Vail filed an amended petition adding the Highway Patrol as a defendant. The district court entered summary judgment for the Highway Patrol on a statute of limitations defense. Stormont-Vail has not appealed that ruling, so the Highway Patrol is no longer a party and has not participated in this appeal. The parties compiled a written record they provided to the district court with a request for a bench trial and judgment based on those materials. The record consists of stipulations to many facts, contemporaneous reports law enforcement officers prepared in the usual course of their duties about the capture of and injury to Dimmick, affidavits, some deposition testimony, and other discovery materials. The district court issued a lengthy memorandum decision and order in October 2018 finding the Highway Patrol to be the law enforcement agency liable under K.S.A. 22-4612 for the cost of the medical care Stormont-Vail provided to Dimmick. The district court found the Highway Patrol had operational control of the coordinated interagency exercise—a circumstance we suggested would be legally significant in *Stormont-Vail I*. See 2016 WL 2772859, at *2. Stormont-Vail has appealed the district court's ruling.

6

On appeal, we review a district court's decision in a bench trial to determine if the factual findings are supported by substantial record evidence, and we then consider whether those facts warrant the ultimate legal conclusions without giving those conclusions any particular deference. See *Kansas Healthcare Stabilization Fund v. St. Francis Hospital*, 41 Kan. App. 2d 488, 503, 203 P.3d 33 (2009). That standard does not change simply because the trial record consists only of written materials and the district court did not hear any live testimony. See *State v. Garcia*, 297 Kan. 182, 186-88, 301 P.3d 658 (2013).

As we recognized in *Stormont-Vail I*, K.S.A. 22-4612 governs the obligation of a governmental entity to pay for medical care provided to a person in its custody. In pertinent part, the statute states:

> "[A] county, a city, a county or city law enforcement agency, a county department of corrections or the Kansas highway patrol shall be liable to pay a health care provider for health care services rendered to persons in the custody of such agencies the lesser of the actual amount billed by such health care provider or the medicaid rate." K.S.A. 22-4612(a).

Enacted in 2006, K.S.A. 22-4612 replaced a common-law rule that imposed liability on the County filing charges against a criminal defendant who required medical care while in custody. *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 997-98, 348 P.3d 602 (2015). The statute aimed to avoid protracted litigation over those obligations and to curtail financial incentives to decline charging an individual to avert significant medical expenses. To that end, the court has construed the statute to place the obligation to pay on "the entity having custody of the indigent offender at the time the decision is made to obtain medical treatment for the offender." 301 Kan. at 1006. The statute relieves the governmental entity of the obligation when the individual in

7

custody has insurance or some similar contractual right to third-party payment for medical expenses. Everybody agrees Dimmick has no such resource.

The statute does not explicitly address two points relevant here: (1) What constitutes "custody"; and (2) how liability should be assessed when more than one law enforcement agency participates in a coordinated operation that results in an individual both being injured and taken into custody. We considered those issues in *Stormont-Vail I*.

First, we held that "custody" includes both formal arrest and detention that is the functional equivalent of an arrest in the sense a person would not be free to leave or feel free to leave. *Stormont-Vail I*, 2016 WL 2772859, at *4. In the *University of Kansas Hospital* case, the court indicated that custody for purposes of K.S.A. 22-4612 could be broader than formal arrest. 301 Kan. at 1006. Because the detainee in that case had been formally arrested—he was handcuffed and told he was under arrest—the court declined to fix the "outer parameters of . . . custody" under K.S.A. 22-4612. 301 Kan. at 1006.

Here, Dimmick was unquestionably in custody before he was shot. He was facedown on the floor surrounded by law enforcement officers. One officer had a rifle pointed at him, and another officer was ready to handcuff him. Whether Dimmick had been told he was under arrest is really beside the point, since he was not free to leave and a reasonable person in his position would have understood as much. That obviously did not change when Dimmick was shot and the call was made for medical assistance. In its written decision, the district court made no factual findings on whether Dimmick had been formally arrested either before he was shot and the ambulance was summoned or afterward.

The second issue requires determining what law enforcement agency had Dimmick in custody when the ambulance was summoned. Again, in *Stormont-Vail I*, the court suggested that in a law enforcement action involving multiple agencies, the agency with

"operational control" would be the one with "custody" of the individual for purposes of K.S.A. 22-4612. 2016 WL 2772859, at *2. We indicated that conclusion should be based on the particular facts absent some sort of formal interagency agreement governing joint law enforcement operations. The stipulated facts presented to the district court in *Stormont-Vail I* did not directly address operational control. As a result, the district court impermissibly drew inferences adverse to Shawnee County in granting summary judgment to Stormont-Vail, necessitating the reversal and remand. 2016 WL 2772859, at *1.

We now make explicit what we intimated in *Stormont-Vail I*: In a coordinated police action involving multiple law enforcement agencies, the agency with "operational control" has the obligation under K.S.A. 22-4612 to pay for medical treatment requested during the action for an injured person taken into custody. We see no reason for some intricate legal standard with a slew of factors in making that determination. Rather, we borrow from what we said in *Stormont-Vail I*. So if the response team acted in something other than "a willy-nilly exercise . . . in a mostly uncoordinated take down of Dimmick," then the test for operational control is simply this: Who was "the captain of the team?" See 2016 WL 2772859, at *2. In a multi-agency action, then, the duty to pay under K.S.A. 22-4612 rests with the agency in charge as determined from the totality of the circumstance. In short, operational control includes or encompasses custody (and, thus, the responsibility to pay) under K.S.A. 22-4612.

An operational control test does not conflict with the *University of Kansas Hospital* decision, 301 Kan. 993, and our court's recent decision in *University of Kan. Hosp. Auth. v. Board of Franklin County Comm'rs*, 58 Kan. App. 2d 367, 468 P.3d 806 (2020). Neither delved into responsibility under K.S.A. 22-4612 for a coordinated law enforcement action involving multiple agencies. Although the concept of operational control is and should be straightforward, we offer some further context, since it drives the statutory obligation to pay in coordinated multi-agency police actions. Custody of a suspect for purposes of K.S.A. 22-4612 rests with law enforcement agency in command,

9

and the imposition of the resulting obligation should not be a bone of contention between the agency with operational control and the assisting or subordinate agencies or among the assisting agencies.

For purposes of K.S.A. 22-4612, we see three broad levels of decision-making or action in a law enforcement exercise like the capture of Dimmick, especially after he entered the house and forcibly held the residents hostage. There is operational or command control involving the overall coordination of the law enforcement personnel and systemic decisions, such as whether to negotiate with the suspect or to launch a forcible extraction. Below that sort of command control lies what might be called strategic decision-making or professional judgment. For example, professional judgment would entail the specific manner in which a SWAT-like team might deploy in a given situation or carry out a forcible extraction once that order had been issued. Finally, there is field implementation covering how particular officers carry out their tasks in the coordinated operation through ground-level judgments. Again, as an example, the Topeka police sergeant's decision to step on Dimmick's arm while giving an oral order to comply reflects a field-level judgment about how best to halt physical resistance to being handcuffed.

When a single law enforcement agency carries out a complex operation involving numerous officers, legal responsibility under K.S.A. 22-4612 remains clear. In a multi-agency action, an operational control test typically ought to yield a readily discernible outcome on the assumption somebody was making the overarching decisions and giving directions to implement them. In turn, that kind of clear outcome serves the purposes of K.S.A. 22-4612 by quickly and easily identifying the government entity that should pay for the medical treatment of a person injured while being taken into custody. There is also something intrinsically equitable and satisfactory about placing that legal responsibility at the top.

We suppose in a multi-agency law enforcement endeavor the agency exercising operational control may not have the legal authority to give binding orders to officers from other agencies. But those officers willingly coordinate and subordinate their efforts to the overarching decision-making of the lead agency. There is no good reason, however, that liability under K.S.A. 22-4612 should somehow shift around simply because operational control relies on voluntary compliance rather than a rigid chain of command. Likewise, liability to pay should not migrate if the negligent conduct of an officer from one agency caused the injuries to the person taken into custody while another agency had operational control. The obligation to pay under K.S.A. 22-4612 does not have a fault-based component to it. Rather, the statute codifies the duty of government entities to attend to the basic needs of individuals they have detained. See *University of Kan. Hosp. Auth.*, 58 Kan. App. 2d at 371-72.

For that reason, we similarly see no reason to impose liability on the City of Topeka because its police sergeant made the immediate call for an ambulance after he shot Dimmick. The ranking Highway Patrol commanders at the scene had a duty to secure appropriate (and timely) treatment for Dimmick, since that agency headed the operation and, therefore, had custody of him. The Topeka police sergeant made a field-level decision to call for medical assistance—a near compulsory course of conduct that did not transfer custody of Dimmick for purposes of K.S.A. 22-4612 from the Highway Patrol to the City of Topeka or, even less plausibly, Shawnee County.

The considerations we have outlined also go a long way in demonstrating why Stormont-Vail's proposed physical custody standard would be an undesirable one. At a systemic level, a physical custody test might discourage multi-agency operations, such as this one, because an agency assisting in a subordinate capacity could be liable under K.S.A. 22-4612 if its officers had physical custody of an injured suspect more by happenstance than anything else at the time the request for medical treatment was made. Similarly, agencies might be willing to participate only in limited ways that would

11

preclude their being liable under K.S.A. 22-4612. As a practical matter, we doubt K.S.A. 22-4612 would significantly dampen multi-agency law enforcement actions. But there is no sound reason to apply K.S.A. 22-4612 in a way that might even theoretically prop up the possibility.

More tangibly, a physical custody test would spawn otherwise unnecessary litigation under K.S.A. 22-4612, as this case illustrates. It is hardly clear which law enforcement agency had custody of Dimmick at the instant the Topeka Police sergeant called for the ambulance. Did the debilitating, if unintentional, gunshot place Dimmick in the custody of that agency? Was he already in the continuing physical custody of the Shawnee County deputy who had him facedown on the floor? Did the officers' combined actions render Dimmick "in custody" before he was shot? In fluid law enforcement operations, trying to establish the physical custody of an individual at the moment an independent event—the call for medical assistance—takes place is fraught with uncertainty and inexactitude.

In this and comparable situations, that proposition would be difficult to accurately assess in litigation months or years afterward. The issue likely would require the reconstruction of seemingly minor circumstances and fine distinctions teased out of rapidly unfolding events based on the recollections of law enforcement officers focused on far more immediate and significant concerns. As we mentioned in *Stormont-Vail I*, the physical custody standard also could prompt legal arguments about whether an officer with one law enforcement agency should be treated as the borrowed servant of another agency and how liability under K.S.A. 22-4612 might be imputed as a result. 2016 WL 2772859, at *5 (mentioning doctrine and citing *Bright v. Cargill, Inc.*, 251 Kan. 387, 404-05, 837 P.2d 348 [1992], as outlining law on borrowed-servant liability). A subordinate agency that employed the officer with physical custody might well assert he or she functioned as the borrowed servant of the primary agency. In those cases, healthcare providers would be plunged into extended litigation as potentially responsible

12

government entities battled each other over which one had physical custody of the injured individual—fomenting the very delays and obstacles to payment the Legislature sought to avert with K.S.A. 22-4612.

We are unpersuaded a physical custody standard is the better mousetrap, so we decline to build it in preference to an operational control test.

Based on the trial record, the district court found that the Highway Patrol had operational control of the assembled response team and thus coordinated the entry into the house and the capture of Dimmick, even though a Shawnee County deputy and a sergeant from the Topeka Police Department exercised immediate physical dominion over Dimmick as he was injured and the call for assistance was made. Without belaboring the facts we have already set out, substantial evidence supports that finding.

The Highway Patrol endeavored to apprehend Dimmick as he drove eastward across Kansas on I-70, and that remained true after he abandoned the stolen minivan and entered the house in Dover. Lt. McCollum exercised control over the scene at the house and told officers from both the Shawnee County Sheriff's Department and the Topeka Police Department that he was in command. Later, Lt. McCollum ceded that role to Major Goodloe. Major Goodloe established a command post from which he briefed supervisors from the other law enforcement agencies about the coordinated operation. He authorized entry into the house to capture Dimmick. Lt. McCollum and Major Goodloe each requested assistance from other law enforcement agencies, but neither relinquished control or command in conjunction with those requests. All of those circumstances support the district court's finding.

To be sure, officers from the Shawnee County Sheriff's Department and the Topeka Police Department coordinated their efforts. In particular, the tactical units worked out an integrated plan of entry and capture. But that is what we have referred to

13

as strategic decision-making or professional judgment. Those efforts did not conflict with or usurp the Highway Patrol's operational command.

As we have explained, in a multi-agency law enforcement exercise, the agency with operational command or control will be responsible under K.S.A. 22-4612 for the payment of medical treatment requested for a person then in custody and injured during the operation. The test typically should be fairly easy to apply, as it is here, thereby advancing the purpose of K.S.A. 22-4612. Based on the district court's well supported factual findings, it correctly concluded that the Highway Patrol had operational control of the coordinated effort to capture Dimmick and was responsible for the cost of the medical care Stormont-Vail provided in treating his injuries. The district court, therefore, properly declined to enter judgment against either Shawnee County or the City of Topeka for the medical care Dimmick received between September 12 and September 29, 2009.

Throughout this opinion, we have endeavored to clearly state we are construing and applying only K.S.A. 22-4612 and the particularized legal responsibility it imposes for payment of medical expenses. Our discussion should not be taken as a more general accounting of potential liability among coordinating governmental agencies for any other purpose or even as analogous authority that might be borrowed as persuasive. More narrowly, of course, we have recognized operational control as the test of first resort to assign the duty to pay under K.S.A. 22-4612 in multi-agency police actions. And it works well here. We, therefore, have no need to consider (and offer no opinion on) situations where that cannot be said. Those would include multi-agency actions with shared operational control or co-captains of the team or those unfolding in a largely formless way without a recognizable captain.

Affirmed.

14